STATE OF NEBRASKA, APPELLEE, v. DANIEL JOHNS, APPELLANT.

177 N. W. 2d 580

Filed June 5, 1970. No. 37280.

Marer & Lazer, Michael L. Lazer, and Bennett G. Hornstein, for appellant.

Clarence A. H. Meyer, Attorney General, and James J. Duggan, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

McCOWN, J.

The defendant, Daniel Johns, was found guilty of grand larceny by a jury and was sentenced to 3 years in the Nebraska Penal and Correctional Complex. The defendant has appealed, and the crucial issues involve constitutional rights to counsel and against self-incrimination.

On April 1, 1968, merchandise was stolen from a loading dock area in Fremont, Dodge County, Nebraska. On the same day, a complaint and information was filed against the defendant charging him with the felonious theft of three Singer sewing machines. On April 3, 1968, the defendant was arrested in Omaha, Nebraska, by two officers of the Omaha police department on an arrest warrant received from Dodge County, Nebraska. The time of the arrest was about 10:30 a.m. After the officers read the warrant to him, the defendant asked if he could call his lawyer. They advised him that he could and he instructed the woman present to try to get hold of his lawyer. The arresting officers took the defendant to the Omaha police department. At about 1:30 p.m., Sgt. Petersen of the Fremont police department and Trooper Hansen of the Nebraska State Patrol contacted the defendant at the Omaha police department. Both officers were investigators with their respective law enforcement agencies. The defendant was taken to a room in the Omaha police station by the two officers. At 1:45 p.m., Sgt. Petersen read a full rights advisory form to the defendant. The defendant acknowledged that he understood the rights being explained and answered "yes" to the question as to whether he wished to waive his rights and give a statement. In response to the first question asked by Sgt. Petersen after the reading

of the rights advisory form, the dfendant responded: "I would like to have my attorney present." Officers Petersen and Hansen then stopped the interrogation, had the defendant cross out the affirmative answer to the question as to waiver of constitutional rights, and write on the advisory form: "I would like to have my attorney present."

The officers then handcuffed the defendant, placed him in a patrol car, and took him to Fremont, Nebraska. They arrived in Fremont at approximately 2:45 p.m. The defendant was taken to the detective bureau in the Fremont police department. The two officers and the defendant were seated around Sgt. Petersen's desk. The defendant was asked to remove his shoes which were taken out of the room for comparison. Thereafter for 30 minutes to an hour, in the presence of the defendant, the officers examined and discussed between themselves the contents of defendant's wallet and personal belongings but ignored the defendant.

At approximately 3:55 p.m., Sgt. Petersen again read to the defendant the complete rights advisory form. At this time, the defendant responded affirmatively to all questions including the question: "At this time do you wish to waive your right to remain silent and your right to have an attorney here and visit with me and give me a statement about this arrest?"

After he had requested the presence of his attorney in Omaha, the defendant did not say anything to indicate affirmatively that he wished to talk further or wanted to make a statement; nor did he do anything to indicate that he had changed his mind about having an attorney present before the rights advisory form was again read to him at 3:55 p.m. Officer Petersen testified that he thought the defendant might want to change his mind, and in answer to the question: "You were going to keep trying anyway until he did, is that right?" said: "Yes, I kept trying."

The defendant's response to the questions asked at

the interrogation commencing at 3:55 p.m. at first were exculpatory. The officers refused to pay any attention to these statements, told him they were not going to listen to that kind of stuff, and did not write them down. At approximately 4:50 p.m., the defendant began to give his confession, which was completed at approximately 5:40 p.m.

Meanwhile, the defendant's attorney had telephoned to Fremont and advised the county attorney of Dodge County that he was representing the defendant and that he did not wish to have the defendant questioned. The county attorney thought that he received the call sometime between 3 and 4 p.m. The county attorney at that time agreed to call the police department and advise them that defendant's counsel did not wish to have the defendant questioned. The county attorney did not call the police until just after the defendant's statement had been completed at 5:40 p.m. At that time he gave them the message.

At a hearing outside the presence of the jury, the trial court first determined that the Miranda warnings were given; that the defendant voluntarily waived his constitutional rights; and that the confession was voluntarily made. The court overruled defendant's objections and admitted the confession into evidence.

The constitutional problems here involve Fifth and Sixth Amendment issues. They also involve both pre-Miranda and post-Miranda rules. Spano v. New York, 360 U. S. 315, 79 S. Ct. 1202, 3 L. Ed. 2d 1265, was decided in 1959, some 7 years prior to Miranda. In the Spano case, it became settled that a defendant formally charged with a felony is entitled to counsel at every step of the proceedings and that a confession obtained at a secret interrogation is involuntary and inadmissible. The Spano rule was followed by this court in State v. Longmore, 178 Neb. 509, 134 N. W. 2d 66. We said: "A secret interrogation of a defendant charged with a felony, when the accused has asked for and been denied

the presence of his counsel, is a violation of his constitutional rights. A confession obtained in violation of the defendant's constitutional rights is involuntary and inadmissible in evidence."

In May of 1964, another federal landmark case was decided. Massiah v. United States, 377 U. S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246. That case held that incriminating statements deliberately elicited from a defendant after indictment and in the absence of his attorney, deprived the defendant of his right to counsel, and such statements could not constitutionally be used against him at trial. In June 1964, the now famous case of Escobedo v. Illinois, 378 U. S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977, followed. Escobedo extended constitutional rights to counsel to a situation prior to indictment, where the investigation has begun to focus on a particular suspect and he has been taken into custody. The Supreme Court said there: "We hold only that when the process shifts from investigatory to accusatory —when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer."

Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A. L. R. 3d 974, was decided in 1966. It continued and expanded these principles in the area of custodial interrogation and the right to counsel. The language of Miranda itself is revealing. "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. * * * If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual

cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent."

The state cases following Spano, all dealing with pre-Miranda trial situations, clearly demonstrate the development and interpretation of the constitutional right to counsel in New York. See, People v. Donovan, 13 N. Y. 2d 148, 193 N. E. 2d 628 (1963); People v. Failla, 14 N. Y. 2d 178, 199 N. E. 2d 366 (1964); People v. Gunner, 15 N. Y. 2d 226, 205 N. E. 2d 852 (1965).

In People v. Arthur, 22 N. Y. 2d 325, 239 N. E. 2d 537 (1968), the New York rule as to pre-Miranda cases was set out. "Once the police know or have been apprised of the fact that the defendant is respresented by counsel, or that an attorney has communicated with the police for the purpose of representing defendant, the accused's right to counsel attaches, and this right is not dependent upon the existence of a formal retainer." The court also said: "There is no requirement that the attorney or the defendant request the police to respect this right of the defendant."

The same principles have been applied to post-Miranda waiver situations. In Commonwealth v. McKenna, 244 N. E. 2d 560 (Mass., 1969), the Massachusetts court held inadmissible any part of the statements obtained by interrogation after the defendant's attorney had called the police station to advise them that the attorney wished to be present at the interrogation of the defendant. In that case, the defendant had asked his aunt to call his lawyer at the time of arrest. He had signed a waiver of rights the evening before which recited: "I do not want a lawyer at this time." He had not accepted the use of the telephone, and had not at any time asked the police for a lawyer, although Miranda warnings were given to him on three occasions, including the one just before interrogation. The court said: "Rights to remain silent and to assistance of counsel may be waived but cannot be forfeited." See, also, People v. Ireland, 75 Cal.

Rptr. 188, 450 P. 2d 580 (1969); United States v. Priest, 409 F. 2d 491 (5th Cir., 1969); State v. Word, 80 N. M. 377, 456 P. 2d 210 (1969); State v. Kelly, 439 S. W. 2d 487 (Mo., 1969).

In the McKenna case, the telephone call was made to the police station, while in the case before us, the telephone call was made to the county attorney. Where a defendant's right to counsel is effectively invoked when his counsel telephones a police officer on the desk, it should, obviously, be invoked as to a defendant formally charged with a felony when his counsel calls the county attorney who is in charge of the entire prosecution. Under the circumstances here, either one has a duty to convey the message immediately to the appropriate police officers.

The defendant not only asked to telephone his lawyer at the time of arrest, he again requested the presence of counsel orally and in writing at the first interrogation in Omaha at 1:45 p.m. Although the defendant did not at any time thereafter say or do anything to indicate affirmatively that he had changed his mind about having his attorney present, and although his attorney had telephoned to assert defendant's rights, nevertheless, the same police officers at 3:55 p.m. repeated the Miranda warnings and recommended the interrogation which ultimately resulted in the confession.

We hold that where the police or prosecutors know that a defendant, formally charged with a felony, is represented by counsel who has requested that no statements be taken from the defendant; and where the defendant, after being advised of his Miranda rights, has unequivocally asked for his attorney; statements deliberately elicited from the defendant by custodial interrogation designed to produce incriminating statements, and undertaken before the defendant has been given an opportunity to consult with his lawyer, are inadmissible, in the absence of an effective waiver.

Where both the defendant and his counsel have previ-

ously attempted to invoke the defendant's constitutional right to counsel; then at the very least, a "heavy burden" rests on the state to demonstrate that the defendant knowingly and intelligently waived his right to counsel. On the facts in this case, that burden was not met.

The Miranda warnings are not intended to be merely rituals to be incanted to a defendant repeatedly until the proper answers are given. Neither does the fact that the proper answers to a rights advisory are ultimately received, automatically constitute a waiver and forfeit all constitutional rights previously invoked. Repetitions of advisory warnings are not a satisfactory substitute for granting an unequivocal request for counsel.

The action of the trial court in overruling the objections to the confession and statements of the defendant was in error and the confession or statements were inadmissible.

The use of any confession obtained in violation of the due process clause requires reversal of the conviction even though unchallenged evidence adequate to convict remains. State v. Longmore, 178 Neb. 509, 134 N. W. 2d 66 (1965); Gallegos v. Nebraska, 342 U. S. 55, 72 S. Ct. 141, 96 L. Ed. 86 (1951).

The judgment is reversed and the cause remanded to the district court for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

NEWTON, J., dissenting.

The facts of this case are set out in the majority opinion. Only two questions are presented, namely: (1) Once a defendant has indicated he wants a lawyer and one is retained, can he waive his lawyer's presence and give a valid statement? (2) Under such circumstances, can law enforcement officers lawfully ask a defendant if he is willing to make such a waiver?

The answer to these propositions must be determined on the basis of rules laid down by the United States

Supreme Court in certain key decisions. The interpretation of these decisions in the federal courts must be accorded primary consideration. The state courts are in conflict on the propositions here presented with a majority answering the two questions mentioned above in the affirmative. This is a case of first impression in Nebraska. Decisions of other states are merely advisory and are not binding in Nebraska, but the federal decisions are of primary importance in arriving at a correct interpretation of the Supreme Court decisions.

Prior to the decision in Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A. L. R. 3d 974, decided in 1966, there were many decisions handed down by the United States Supreme Court regarding various privileges incorporated in the Bill of Rights. Among these earlier decisions are Massiah v. United States, 377 U. S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246, and Escobedo v. Illinois, 378 U. S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977. It appears to have been the intent of the court in Miranda to clarify some of these earlier decisions as it is therein stated: "We granted certiorari in these cases, * * * in order further to explore some facets of the problems, thus exposed, of applying the privilege against self-incrimination to in-custody interrogation, and to give concrete constitutional guidelines for law enforcement agencies and courts to follow." It must be recognized that this is not a case involving a denial of counsel. Defendant was permitted to contact his lawyer and his lawyer was not denied access to defendant. In fact, counsel made no effort to contact his client.

Although Miranda appears to be controlling in the present situation, it seems advisable to consider the Massiah and Escobedo decisions. In Massiah, the defendant was tricked into making a confession by having an accomplice, acting as an agent for law enforcement personnel, elicit statements from defendant which were listened to over a concealed microphone. Although sometimes interpreted as completely barring a confes-

sion made after indictment and retention or request for counsel, the court stated: "We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted. All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against *him* at his trial." Escobedo lays down the rule that once a defendant requests a lawyer's presence, questioning must cease until the lawyer is present. The case was aggravated by a deliberate refusal by the police to permit counsel to see his client. The court stated: "We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer." Neither Massiah nor Escobedo go so far as to deny the right of a defendant to waive his constitutional right to counsel.

The constitutional rights discussed in Miranda and other decisions are personal in nature. They are intended to protect individual defendants from coercion and trickery. They can be waived or asserted only by the defendant or his authorized representative. Counsel cannot ordinarily assert or waive them against the will of his client, but the client may do either with or without the consent of counsel. In this regard, so long as he acts knowingly, intelligently, and voluntarily, he is the master of his own fate and may determine the course to be pursued. It is conceded that the right to remain silent may be waived. Is the right to consult counsel any more sacred or important? If a defendant determines it is best to proceed and to give information in the absence of his lawyer, should he not be free to do so? Miranda answers these questions clearly. The court stated:

"Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. * * * the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning *if the defendant so desires.* * * * An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. * * * In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today. * * * He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity

afforded him, *the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement."* (Emphasis supplied.)

Miranda repeatedly makes it clear that the right to consult counsel may be waived. This is the interpretation placed upon United States Supreme Court decisions governing situations such as the one now before us by the federal courts. In Coughlan v. United States, 391 F. 2d 371 (9th Cir., 1968), the court said: "At the time the confession was obtained, the appellant was represented by court-appointed counsel. This fact was well known to the officers who interrogated the accused. No notice was given by the officers to defendant's counsel of the intended interviews and he was not present when the statement was taken. * * * Under this state of the facts, appellant contends that his constitutionally guaranteed right to counsel was effectively denied. We are asked to rule that any statement, admission or confession secured by peace officers from a defendant represented by an attorney, where the attorney was not timely advised of the proposed interview or interrogation, be rejected as violative of the right to counsel. Appellant recognizes that this Sixth Amendment right may be voluntarily waived, but, at oral argument, it was contended that such a waiver would never be knowing and truly voluntary unless counsel was present to advise the client. * * * It may well be that the day is approaching when the right to counsel may be expanded to the point where an accused may only be interrogated by the police in the presence of his lawyer. However, no persuasive precedent for the holding here sought has come to our attention. Appellant relies heavily on the teaching of Miranda v. State of Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Miranda specifically recognizes prior cases holding that the right to counsel may be waived. Here a clear and knowing waiver was shown. We are unwilling to attempt to ex-

pand the Miranda ruling to the extent sought by appellant."

In United States v. Fellabaum, 408 F. 2d 220 (7th Cir., 1969), it is said: "The issue comes down to this: May a defendant, who has an identified counsel, be questioned when, after adequate constitutional warnings, he has fully, repeatedly, and affirmatively declined the presence of counsel? We conclude, under the circumstances appearing in this case, that such questioning is fully consistent with all constitutional safeguards." To the same effect are the following cases: Arrington v. Maxwell, 409 F. 2d 849 (6th Cir., 1969); Reinke v. United States, 405 F. 2d 228 (9th Cir., 1968); Wilson v. United States, 398 F. 2d 331 (5th Cir., 1968); State v. Lopez, 80 N. M. 130, 452 P. 2d 199 (1969); Commonwealth ex rel. Craig v. Maroney, 352 F. 2d 30 (3d Cir., 1965); Conway v. State, 7 Md. App. 400, 256 A. 2d 178 (1969); People v. Smith, 42 Ill. 2d 479, 248 N. E. 2d 68 (1969); State v. Blanchey, 454 P. 2d 841 (Wash., 1969); Mathies v. United States, 374 F. 2d 312 (D. C. Cir., 1967); Beatty v. United States, 377 F. 2d 181 (5th Cir., 1967). See, also, Shultz v. United States, 351 F. 2d 287 (10th Cir., 1965). In three of these cases, Arrington, Reinke, and Beatty, the defendant solicited the opportunity to speak. In the others he did not.

Can it be truthfully maintained that coercion exists or is present when a law enforcement officer repeats the Miranda warnings and simply inquires of the defendant if he is then willing to waive his constitutional rights? In what manner is the defendant wronged by a simple inquiry as to whether or not he will waive these rights? He is under no compulsion, has a full understanding of the situation, and the decision is his to make. Under the circumstances, it appears that the majority opinion goes far beyond any federal rules now in force and represents a material and unwarranted expansion of the law governing the admissibility of confessions. The opinion holds, in effect, that once a defendant has de-

manded or obtained a lawyer, he cannot thereafter be questioned under any circumstances in the absence of his lawyer and cannot waive the right to have his lawyer present, at least unless such waiver is made in the presence of his lawyer. It is contrary to our holding in State v. Godfrey, 182 Neb. 451, 155 N. W. 2d 438 (1968), wherein in speaking for the court, McCown, J., said: "The fact that a defendant, as a part of the initial procedures at a police station, after full Miranda warnings, is asked whether he desires to make a statement at that time, and answers negatively, does not automatically invoke his right to counsel and render inadmissible any subsequent statement obtained in the absence of counsel. Such a factual circumstance, coupled with other facts present, does not prohibit or invalidate a later waiver voluntarily, knowingly, and intelligently made." It is also contrary to our ruling in State v. Woods, 182 Neb. 668, 156 N. W. 2d 786 (1968), wherein this court held that although the accused had previously requested an attorney, he could thereafter change his mind, waive the right to an attorney, and make a valid statement.

I believe our decision in this case is illogical and incorrect and consequently, I must respectfully dissent.

WHITE, C. J., and CARTER, J., join in this dissent.

CARTER, J., dissenting,

I wholly disagree with the reasoning of the majority opinion for the reasons so aptly set forth in the dissent of Judge Newton. In my judgment, the time has come to clearly set out my concept of the law applicable to the case and the deep-rooted principles which, as I view it, are wholly abandoned by the holdings of this opinion.

In 1865, the Fourteenth Amendment to the Constitution of the United States was enacted. While the validity of its enactment has been and is still questioned in many quarters, its meaning also has become a most serious subject of controversy. The intention of the amendment at the time of its submission was to give to the

recently freed slaves the same rights as other citizens, including equal privileges and immunities guaranteed by the Constitution of the United States. Its purpose was to give slaves the same rights as other free men; not to transfer power from the states to the federal government.

The language of the amendment in accomplishing this intent and purpose contained a provision stating that: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; * * *." The purpose of this provision was primarily to prevent the former slave states from defeating the intent of the Fourteenth Amendment by state legislation. Prior to the enactment of the foregoing provision, "due process of law" was determinable under similar provisions of state constitutions and the laws of the state, and was a subject outside the powers granted to the federal government. By a series of decisions by the Supreme Court of the United States, commencing with the Slaughter-House Cases in 1873, the United States Supreme Court swept aside the contention that the reference to due process as used in the Fourteenth Amendment was solely a protection to the newly made free men, that they were entitled to the same existing due process as other citizens, and was held to be a transfer to the federal government of the power of the states to fix and determine what amounted to due process of law in the state courts. The fear that such a result might occur is evidenced by a letter of Senator Orville H. Browning of Illinois, published in The Cincinnati Commercial on October 26, 1866, in which he said: "If the proposed amendments be adopted, they may and certainly will be used substantially to annihilate the State judiciaries. * * * Be assured, if this new provision be engrafted in the Constitution, it will, in time, change the entire texture and structure of our government, and

sweep away all the guarantees of safety devised and provided by our patriotic sires of the revolution." A casual reference to recent cases demonstrates the correctness of Senator Browning's prophecy. The intention and purpose of the amendment is completely ignored in favor of one by which the Supreme Court of the United States seizes power that was intended to remain with the states.

While I am wholly in disagreement with the method employed by the Supreme Court of the United States in determining due process in the state courts by judicial fiat at the expense of the states, this court is required under the supremacy clause to recognize and be bound by the holdings of that court when rooted into the Constitution. But in the absence of specific holdings applicable to factual situations before us, I do not subscribe to the expansion of the ritualist rules of that court which can only serve to strap down and mitigate the efforts of law enforcement officers in the performance of their duties in enforcing the law.

The ritualistic limitations imposed on law enforcement officers by the Supreme Court of the United States are justified by that court on the ground that they are necessary to restrict over zealous officers from exceeding their authority. That some officers occasionally have done so, I do not deny. But instead of providing sanctions, civil or criminal, against officers who abuse their lawful authority, the court burdens all law enforcement officers, the innocent and guilty alike, with ritualistic limitations that hamper all law enforcement officers in the performance of their duty. It is a case of burning the house down to eliminate the invading cockroach. The result is that law enforcement is breaking down, criminals are permitted to continue their nefarious ways, and the certainty of punishment for criminal wrongdoing becomes less and less a deterrent to crime.

In most criminal cases coming before us, including those related to punishment for crime, the guilt or innocence of the defendant is not an issue. Such is the case here.

The issues which confront us are largely whether the constitutional rights of the defendant have been abridged; rights which are such because the Supreme Court of the United States proclaims them to be such, and which then roots them into the due process clause of the Constitution to avoid decisions adverse to their encroachment.

The limitations imposed on law enforcement officers for the purpose of coercing police activities, whether or not they are prejudicial to the rights of the defendant, utterly fail to consider the constitutional rights of the victim of the crime and the right of the public to be safe in their person and property. The public interest is completely ignored in favor of those who willfully violate the law. The result is an ever growing crime rate and a judicially supported inability of law enforcement officers to maintain law and order. Such a failure has precipitated the destruction of every major republican form of government in the past and there is no reason to believe that it will not have the same effect now and in the future.

We as judges are obligated to support the Constitution of the United States and the Constitution of the State of Nebraska, and not to subvert either. This I propose to do within the limits of my ability. This means that we are obligated to follow the Constitution of the United States as interpreted by the Supreme Court of the United States. This I will do whether or not I agree with its holdings. But I do not feel that I am under any obligation to forecast or prophecy what that court may or may not hold in the future, particularly where I am in disagreement with the interpretations it has placed on the plain intent of the Fourteenth Amendment from which it asserts the source of its power.

In the instant case, the majority opinion expands the constitutional meaning of due process far beyond any decision rendered by the Supreme Court of the United States. It is for that court and not this one to expand, limit, or recede from the decisions it has rendered.

With these views on which I hold deep convictions, I cannot join in the majority opinion. I cannot, in good conscience, subscribe to its rationale and thereby participate in the furtherance of a judicial policy that not only offends my sense of justice, but also tends to destroy the maintenance of law and order so essential to the preservation of government by a free people. The drafters of the Constitution placed their full confidence in the Supreme Court of the United States to maintain it in accordance with its meaning when it was adopted and provided no means by which the states could defend themselves against misconstruction and encroachment. Under such circumstances, it is the duty of state courts to defend their jurisdictions within the limits of the oaths of office they have assumed. To do otherwise is to meekly submit to encroachment and concur in the reduction of the power of the state to a condition of vassalage.

In the enforcement of the criminal law, state courts are not devoid of intelligence, integrity, and a proper regard for justice as the Supreme Court of the United States seems to imply. Instead of spending our time in the writing of quibbling opinions concerning the scope of some ritualistic formula imposed upon us, the court should engage itself in determining the guilt or innocence of the defendant. The criminal law has become a labyrinth of ritualistic rules which operate for the benefit of the criminal in escaping just punishment for his crimes. The present case is a glaring example of the misapplication of rules already senseless in their origin and purpose. It is time that we take the handcuffs off law enforcement officers and put them back on the criminal where they belong. The verdict of the jury and the sentence of the learned trial court in this case should be affirmed.

WHITE, C. J., and NEWTON, J., join in this dissent.

SPENCER, J., concurring.

I join in the reversal of the judgment herein and the remand of the cause to district court for further pro-

ceedings because when defendant's counsel called the county attorney from Omaha and advised him that he did not wish to have the defendant questioned until he could visit with him, this request should have been immediately communicated to the police department and respected. The prosecution was under the direction of the county attorney and he was a proper party to contact in this situation. A delay in the transmission of the request for 1 to 2 hours, during which period the police worked on the prisoner to obtain a confession, cannot be condoned. To do so is to adopt a procedure which will effectively deprive a defendant of his constitutional right to counsel.