**STATE of Iowa, Appellee,**

v.

**Robert Anthony WILLIAMS, a/k/a Anthony Erthel Williams, Appellant.**

**No. 53743.**

Supreme Court of Iowa.

Dec. 15, 1970.

Rehearing Denied March 9, 1971.

Henry T. McKnight, Des Moines, for appellant.

Richard C. Turner, Atty. Gen., G. Douglas Essy, Asst. Atty. Gen., and Ray A. Fenton, Polk County Atty., Des Moines, for appellee.

LARSON, Justice.

Pursuant to indictment charging defendant with the crime of murder, in violation of sections 690.1 and 690.2 of the 1966 Code, filed in Polk County District Court on February 6, 1969, a plea of not guilty was entered and trial by jury began on April 30, 1969. A verdict of guilty was returned on May 6, and on May 14 defendant was sentenced to imprisonment for life as provided by section 690.2 of the Code. He appeals. We affirm.

As grounds for reversal appellant contends (1) that the trial court erred in overruling his motion to suppress the State's evidence offered by all witnesses as to ad-

missions against interest, statements, demonstrations and confessions made by him while in police custody on an automobile trip from Davenport to Des Moines, Iowa, on December 26, 1968; (2) that evidence of admissions against interests, statements and confessions made by defendant should not have been admitted in evidence at the trial because it was violative of the Fifth and Sixth Amendments to the Constitution of the United States and under the Constitution of the State of Iowa, and the waiver of those rights had not been demonstrated. In short, it is appellant's contention that under these constitutions and the decisions of the courts since the Escobedo and Miranda cases the State failed to sustain its burden to show the defendant voluntarily gave the officers with whom he was riding information, some of which led to the discovery of the body of the murdered child, and that he knowingly and intelligently waived his right to remain silent and to have the assistance of counsel at the time of giving that information.

We shall presently discuss the propositions advanced by appellant to sustain his contentions, but first we set out a short statement of the circumstances surrounding the crime and the apprehension, custodial treatment, and transportation of defendant to Des Moines on December 26, 1968.

On December 24, 1968, the Powers family attended a wrestling tournament in the YMCA building in Des Moines, Iowa. When Pamela Powers, age 10, failed to return from a visit to the washroom a search was started for her, but she could not be found in the building, and the police were called. About that time, or between 1 and 1:30 P.M., the defendant Williams, who had a room on the seventh floor of the building, was seen in the lobby coming from the elevator carrying some clothing and a large bundle wrapped in a blanket similar to those provided in the YMCA rooms. He spoke to several persons on the way out, explaining to one party that he was carrying a mannequin. He requested the aid of a 14-year-old boy to open first the

Locust Street door and then the door to his Buick automobile parked on the south side of the street facing east. This boy testified that when the defendant Williams placed the bundle in the passenger seat he "saw two legs in it and they were skinny and white." Efforts by YMCA personnel to view the object were thwarted by defendant as he closed and locked his car doors and drove away. They also called for the police.

Pursuant to an A.P.B. put out by the Des Moines police department defendant's Buick car was found in Davenport, Iowa, on December 25, 1968, and a search for him in that area was made by Davenport, Des Moines, and State Bureau of Criminal Investigation officers.

On the morning of December 26 at about 8:45 A.M. Mr. McKnight, a well-known Des Moines attorney, came to Detective Leaming's office at the Des Moines police station and informed the officers present that Williams was going to surrender and there would be a telephone conversation with him at Davenport around 9 A.M. A call was received about that time from the Davenport police advising that Williams had turned himself in and, at Williams' request, he was permitted to talk to Mr. McKnight, who allegedly then told Williams not to talk until he arrived back in Des Moines and saw McKnight. Contending the officers heard that admonishment and agreed not to interrogate Williams before they arrived back in Des Moines, McKnight assured Williams he would be in the custody of good officers and would be safe. Captain Leaming and Detective Nelson were then dispatched to Davenport to bring Williams to Des Moines. On the return trip Williams made statements and revelations which became the subject of defendant's motion to suppress and the waiver issues involved herein.

 I. The concept of waiver of one's constitutional rights during the various stages of the criminal process, it is said, has long been recognized by the

courts. 21 Am.Jur.2d, §§ 219, 316, 317. Also see State v. McClelland, Iowa, 164 N.W.2d 189, 195; Mullaney v. State, 5 Md.App. 248, 246 A.2d 291, 301; State v. McPherson, Iowa, 171 N.W.2d 870, 873; Land v. Commonwealth, 1970, Virginia Supreme Court of Appeals, 176 S.E.2d 586. Almost all of the protections which the federal and state constitutions provide for the citizen, such as the Sixth Amendment's right to counsel and the Fifth Amendment's privilege against self-incrimination, may be relinquished by him. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694. Vol. 19, Am.Jur. Proof of Facts, Annotated, Waiver of Rights under Miranda, contains an excellent review of the entire subject, § 1, p. 3 to § 50, p. 85, inclusive. Waiver has often been defined in this regard as "an intentional relinquishment of or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L. R. 357; State v. Karston, 247 Iowa 32, 72 N.W.2d 463; People v. Marsh, 14 Mich. App. 518, 165 N.W.2d 853 (1968); Babbs, Inc. v. Babb, Iowa, 169 N.W.2d 211 (1969); Broadbent v. Hegge, 44 Wis.2d 719, 172 N.W.2d 34 (1969). Miranda is not unique in its affirmation of the traditional concept of the ability and right of an accused to waive his fundamental constitutional rights with or without his counsel's consent or presence during the pretrial stages of the criminal process. See Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. Nor is it especially distinctive in its specific holding that the right to counsel and the privilege against self-incrimination may be waived by an accused during the period of custodial interrogation. State v. Clough, 259 Iowa 1351, 147 N.W.2d 847; State v. Sanders, 276 N. C. 598, 174 S.E.2d 487 (1970). The Miranda decision is significant because of its acquiescence with the Escobedo rule that counsel is essential during the in-custody interrogation if he is to be of meaningful assistance to his client, because of its skeptical attitude toward what precisely is a waiver "knowingly and intelligently" made, and because of its uncomprising delineation of the evidentiary requirements which must be met by the prosecution to "demonstrate" a valid waiver.

Thus, the rule we draw from Miranda and subsequent high court decisions is that whenever a person is taken into custody or his freedom of action is restrained by law enforcement officers "in any significant way" and after he has been given the required warnings, several choices or alternatives of action are open to him. (1) He may decide to waive the right to consult with and have counsel present with him during the interrogation, relinquish his privilege against self-incrimination, and respond to the questions or suggestions of the officers. Clearly, such a waiver may be made after the accused has discussed the matter with an attorney who has explained the potential ramifications of his decision. Miranda, however, does not require the accused to consult with an attorney before he makes the waiver decision. He may do so right after receiving the warnings or later and in the total absence of advice from counsel. See Miranda v. Arizona, supra, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, at page 723; Vol. 80, Harvard Law Review, p. 204. (2) The accused, after waiving his rights and responding to some questions and giving some information, may decide to cut off the questioning and exercise his privilege of silence and his right to immediate aid of counsel. Once he has manifested that intention, further interrogation must cease until his attorney is present.

It also appears from Miranda that the accused may limit the scope and ambit of the interrogation and, when this limited waiver is enunciated, it must be respected, and of course if he is unsure of whether he should make a statement and requests the assistance of counsel, that request must be honored and further interrogation must cease until he has consulted with an attorney and thereafter consents to be questioned or voluntarily and willingly gives

information. Furthermore, if he is indigent and requests counsel be appointed for him, this must be done and a reasonable opportunity afforded to confer with counsel.

■ Waiver, of course, may not be presumed from a silent record, but neither is an oral or written expression required. A waiver may be found from an examination of all the attendant facts and circumstances. In Johnson v. Zerbst, supra, it is stated that determination must depend on the facts and circumstances of each case. "Despite the fact that the testimony does not show an express waiver of appellant's right to remain silent and to counsel, we hold that the totality of the circumstances—the attendant facts of the case—are such as implicitly show that appellant voluntarily and intelligently relinquished these rights when he made his incriminating admissions." Mullaney v. State, supra, quoted with approval by us in State v. McClelland, supra at page 195 of 164 N.W.2d.

■ In summary, Miranda devoted its principal attention to the issue of voluntariness in giving of waivers, and laid down certain requirements to guide and assist trial courts in resolving the question of voluntary waiver when it arises, either on a pre-trial motion to suppress a defendant's statement or demonstration, or on a voir dire examination at trial. Although, in motions to suppress, questions involving the evaluation of credibility such as whether a certain statement was or was not made (the well-known swearing contest) the trial court must in the first instance pass judgment thereon, that determination is subject to our review. State v. Leiss, 258 Iowa 787, 791, 140 N.W.2d 172, 175. Also see Vol. 19, Am.Jur. Proof of Facts, Waiver of Rights under Miranda, § 45 and citations. Thus, the appellate court has the duty to review rulings, in voir dire or in the trial proper, to see that the accepted statements are supported by other persuasive evidence and that none of the strict rules of proof set out in Miranda were vio-

lated by the trial court in passing on the admissibility of evidence produced on the issue as to whether the accused waived his right to remain silent and to have the present assistance of counsel. To that extent we review the facts. See Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77, which required a review of the facts previously found sufficient to constitute a waiver.

■ In any event, we give weight to the trial court's findings of fact, but are not bound by them (Rule 344(f) (1), R.C.P.), and note that the rules as announced in Miranda require generally that the State "demonstrate" to *our* satisfaction that defendant had been duly advised of his constitutional rights prior to the statements or information given, that he voluntarily, knowingly, and intelligently made the alleged statements after the warnings were given to him, and that they were not secured by force, threats or promises, or by artifice, deception, trickery or fraud. Failure to so demonstrate compliance with these requirements, of course, would call for a rejection of a claim of waiver by an appellate court.

■ In passing on the adequacy of the State's showing in these regards, we have recognized the totality-of-circumstances test for a showing of waiver of constitutionally-protected rights in the absence of an express waiver. After a careful review of the circumstances shown herein, we must conclude as did the trial court that they were sufficient to admit into evidence before the jury the incriminating statements and the information obtained from Williams on his in-custody automobile trip from Davenport to Des Moines.

II. It appears from this record that defendant first filed a pretrial motion to suppress, alleging the information obtained from him by Captain Leaming was secured in such a way as to violate defendant's right under the Sixth Amendment to counsel or to counsel's present assistance, and

to violate an alleged agreement between the officer and defendant's counsel that there would be no interrogation of defendant until their return from Davenport.

In his standing objections, timely made during trial and overruled by the court, defendant also maintained all information obtained by or through Leaming on his trip from Davenport in the Des Moines police car was secured in violation of the Fifth and Sixth Amendments to the federal constitution and of the due process clauses of the state and federal constitutions.

In the deferred ruling on defendant's motion to suppress, the trial court found (1) that the return trip from Davenport was a critical stage in the proceedings and the defendant could have had the assistance of counsel before making statements if he had made such a request. (2) that there was an agreement between defense counsel and police officials to the effect that defendant was not to be questioned on the trip to Des Moines, but that he would talk to police in the presence of his attorney when they arrived, (3) that even if that agreement were violated, it would not require suppression here, but did serve the purpose of establishing defendant's state of mind in deciding whether to give some information to the officers before they reached Des Moines, and (4) that under all the evidence produced at the hearing the court found as a fact that the defendant did freely and voluntarily give such information to the officers.

Under this record we are also satisfied that defendant was adequately advised of his rights and understood them well, that evidence of the time element involved on the trip, the general circumstances of it, and the absence of any request or expressed desire for the aid of counsel before or at the time of giving information, were sufficient to sustain a conclusion that defendant did waive his constitutional rights as alleged. It seems clear no statements or demonstrations which would connect defendant with this crime were made during the trip from Davenport to Grinnell, a distance of some 130 miles consuming two hours of time and that as they approached the Grinnell exit the defendant suddenly, spontaneously, voluntarily, and with no prompting, asked the officers if the child's shoes had been found, and then told where he put them when he stopped for gas on his way to Davenport. Even if defendant had chosen to remain silent at first, he was free to change his mind about talking to the officers and, as a matter of fact under the circumstances revealed, we think he did so as he approached Grinnell. We are satisfied that at this time he intelligently and informedly waived his right to the presence of his counsel, and we agree with the trial court that "These findings are made beyond a reasonable doubt."

In the trial proper, the defendant also made standing objections to all testimony of Captain Leaming related to his statements or actions on the return trip to Des Moines for the reason that defendant's statements were not voluntary and were made while he was in custody and when he was denied effective advice of counsel. They were generally overruled.

It seems abundantly clear that in overruling defendant's motion to suppress and in overruling his objections during trial to the evidence obtained by or through conversations between the defendant and the officer on the return trip to Des Moines, the trial court considered the totality of the circumstances as demonstrating beyond reasonable doubt defendant's voluntary and intelligent waiver of his right to remain silent and to have the assistance of counsel at that time. Thus, it appears the court followed the approved test for determining compliance with the Miranda mandates and committed no error in its rulings on admissibility.

III. A careful review of the record does not indicate there was any evidence compelling a conclusion as a matter of law that defendant's statements, revelations, or

demonstrations were inadmissible at his trial.

It is undisputed that defendant was duly advised of his constitutional rights by the officers who had him in custody, i.e., Lieutenant Ackerman of the Davenport police department, Judge Metcalf, and Captain Leaming of the Des Moines police department, the latter just before they started the trip to Des Moines about 2 P.M. on December 26, 1968. It is undisputed that defendant consulted his attorney McKnight by telephone before he turned himself in and later at the Davenport police station before returning to Des Moines, and twice with an Attorney Kelly during his brief stay in Davenport. No further counsel assistance was requested.

It is also undisputed that defendant made no statements or revelations to the officers prior to their approach to the Grinnell exit of the freeway about 130 miles from Davenport, and that shortly after leaving Davenport Captain Leaming told defendant Williams that he did not want him to answer but he wanted him to think when they were driving down the road. He asked Williams to observe the weather. It was then raining, sleeting and freezing, and visibility was very poor. He told Williams they were predicting snow that night and said, "I think that we're going to be going right past where the body is, and if we should stop and find out where it is on the way in, her parents are going to be able to have a good Christian burial for their little daughter. If we don't and it does snow and if you're the only person that knows where this is and if you have only been there once, it's very possible that with snow on the ground you might not be able to find it." It also appears Williams had been told by his attorney something to the effect that he would have to tell the officers where the body was.

It is undisputed that no threats of any nature were made to Williams, that both counsel consulted by Williams prior to the trip told him not to talk until in McKnight's presence in Des Moines, and that there was no counsel available in the automobile on the return trip to Des Moines.

It is also undisputed that Williams was an escapee from a mental institute in Missouri, but his conduct and associations for several months had not indicated anything but normal behavior, and that the court ordered an examination at an Iowa Mental Health Institute, which did not find him incompetent or insane at this time.

The principal dispute is whether Officer Leaming attempted to interrogate Williams in the automobile during the trip to Des Moines. Williams said Leaming questioned him periodically concerning where the body was, not in rapid succession but every few miles. He recalled specifically a statement by Captain Leaming while they were drinking coffee at the Grinnell service station that "You might as well tell us where the body is, we have an idea it's near Mitchellville, and when we get back to Des Moines, your attorney and you will accompany us back here and show us where the body is", a suggestion which conformed with the information already given him by his attorney. He also said Captain Leaming told him his attorney McKnight was ill with a heart ailment and it would be bad to make him go out at night to hunt for the body. On the other hand, Captain Leaming and Officer Nelson denied any interrogation of Williams and said the conversation, except for Leaming's first statement, did not relate to the crime charged but related to religion and what people thought of Williams in Des Moines. Captain Leaming further denied any promise to Williams or his attorneys that he would not attempt to question Williams on the trip or that he made any reference to McKnight's health at that time.

There is also a dispute as to whether this officer had an agreement with Attorney McKnight that there would be no interrogation of Williams until they arrived in Des Moines when all questions would be

answered, and that they were to come straight back to Des Moines. Captain Leaming denied such an agreement, but there was testimony from other officers and the defendant which would support a finding that was counsel's understanding of the agreement.

On the other hand, Captain Leaming testified that as their automobile approached the Grinnell interchange Williams said to him, "Did you ever find her shoes?" and when Leaming said he didn't know but understood some things had been found at the rest area west of Grinnell, Williams replied, "No, I didn't put them with the rest of the clothing" and indicated with a nod of his head northward toward a Skelly station saying, "I put the shoes right up there, that filling station * * * I bought $2.00 worth of gas" and "I went around behind the building and dropped the shoes into an empty cardboard box." He further described the shoes or boots made of brown leather. A search for them did not reveal the shoes, but the station attendant recognized Williams as the party that stopped there on Christmas eve. Captain Leaming further testified that Williams told of leaving some clothes and a blanket at the rest area west of Grinnell and that when they approached the Mitchellville turn-off, he said, "I am going to show you where the body is" and proceeded to do so, although he missed the correct back road the first try. Officer Nelson corroborated this testimony, and other officers in contact with Captain Leaming aided in the search and recovery of the body.

Whether the officers questioned Williams on the trip to Des Moines and whether they had agreed to come straight back to Des Moines with the defendant without any stops, were questions of fact, and in this so-called swearing contest the fact finder must resolve the questions. We find there is substantial evidence to support the trial court's finding of fact, and as to the jury's determination of which version was correct there can be no doubt. It is only in an extreme case, where the findings are without substantial support or the record is clearly against the weight of the evidence, that we will interfere with the fact-finding of the court or jury. State v. Everett, Iowa, 157 N.W.2d 144 (1968); State v. Hardesty, 261 Iowa 382, 394, 153 N.W.2d 464, 472 (1967); Greenwald v. Wisconsin, supra, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77. Therefore, unless the trial court erred by failure to consider all necessary circumstances to resolve the questions of waiver, the judgment rendered herein must be affirmed. We find no such failure evident in these proceedings.

IV. The circumstances to be considered in determining waiver are many and varied depending upon each particular case. In State v. McClelland, supra, 164 N.W.2d 189, we reviewed the evidence revealing the totality of circumstances and declared, despite the fact that the testimony did not show an express waiver of appellant's right to remain silent and to the assistance of counsel, the attendant circumstances clearly demonstrated the wholly voluntary nature of defendant's incriminating statement, and that they were admissible in evidence. We reaffirmed our position in this regard in State v. McPherson, Iowa, 171 N.W.2d 870, and upheld the conviction because the proof of compliance with the federal Miranda mandates was sufficient to justify the ruling. Also see State v. Davis, 261 Iowa 1351, 157 N.W.2d 907.

In State v. Blanchey, 454 P.2d 841 (Wash. 1969), a case quite similar to the case at bar, the court considered the argument that incriminating statements made by defendant while flying back to Seattle under police escort were inadmissible, even though he had been given the Miranda warnings, because his right to the assistance of counsel at all times could not be met in the flight across the country. It rejected the contention and held, after defendant hd been duly warned, the attendant facts demonstrated that the defendant's statements were made of his free will and while he was aware of his rights including

the right to assistance of counsel before making a statement, that he requested no assistance of counsel, voluntarily gave the statements, and thus had no cause for complaint. Also see People v. Robles, 27 N.Y. 2d 155, 314 N.Y.S.2d 793, 263 N.E.2d 304.

 Without an unnecessary review here of all the attendant facts in the case at bar, we are satisfied there is substantial evidential support for the finding that the defendant was given due and timely warnings under Miranda, that he understood them and had legal advice as to his right to remain silent and right to assistance of counsel before making any statement to the authorities, that he was not coerced or intimidated by the officers, and his statements were not secured by trickery or fraud. It seems clear, after considering the statement of Captain Leaming about the difficulty in finding the body after a snowfall and the statement of his own attorney that he would have to show where she was, the decision to reveal her whereabouts during the trip was made by his own free will. This, we hold, he could do despite the instructions of his attorneys and even their understanding with the officers that no such information would be obtained during the trip. What really caused his decision to speak out, only he knows, but we are satisfied there were sufficient proper reminders to justify the decision, and that it could not be said as a matter of law that Captain Leaming's suggestion was so improper as to make the admissions inadmissible. Books may be written on what is or is not proper police procedure in this regard, but we hold here it was not cause to reject the evidence adduced on this trip.

 Although there are some jurisdictions that seem to hold there could be no waiver of one's rights except in the presence of his attorney, we do not subscribe to that view. See United States ex rel. Magoon v. Reincke, D.C., 304 F.Supp. 1014. We hold that, without a clear showing of mental incapacity or weakness, *the*

*will of the accused* when intelligently and voluntarily exercised is paramount.

It is true, the reporter in 164 N.W.2d 330 in headnote 12 concludes a "Miranda waiver taken in absence of defendant's attorney and without his permission was ineffective" and from this appellant contends we in State v. Hancock, supra, adopted the rule that no waiver could be made by an accused without his lawyer's consent. That is not true, and a careful reading of Hancock will reveal we dealt there with a limited stipulation for a specific purpose, that an attempt to introduce evidence of admissions beyond the polygraph test violated the agreement and was not waived by the accused. It is not authority for the proposition that waiver in this jurisdiction is dependent upon the presence of counsel at the time.

V. Appellant's contention that the protection furnished by the Sixth Amendment covers also any testimony offered by the State which was obtained by, through, or under the officers to whom the demonstrations, statements and confessions, were made, would appear to have merit, but in view of our rejection of his claim regarding the information given Captain Leaming, we need not consider further this complaint. If he waived as to the officers in the car, he also waived as to those who obtained information through them.

VI. Having carefully reviewed all the authorities cited by appellant and the State and many we have found which deal with waiver of constitutional rights as raised herein since Escobedo and Miranda, we must conclude that the trial court did not err in overruling defendant's motion to suppress and in its rulings on objections to evidence of statements, demonstrations, and admissions against interest due to waiver. Further complaint as to the court's instructions in appellant's motion for a new trial have been considered and are deemed without merit. There being no

error, the conviction and judgment must be affirmed.

Affirmed.

MOORE, C. J., and LeGRAND, REES and UHLENHOPP, JJ., concur.

STUART, RAWLINGS, MASON and BECKER, JJ., dissent.

STUART, Justice (dissenting).

After more "soul searching" than should be necessary in an appellate decision, I reluctantly dissent from the majority opinion. This conclusion was made doubly difficult because the evidence so clearly connects defendant with this most reprehensible crime and because I personally believe there is nothing morally or legally wrong in permitting police officers to use psychology to secure incriminating statements from a defendant without counsel.

Since Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, however, the United States Supreme Court has held otherwise and I cannot escape the conclusion that when the totality of the circumstances test is applied to this evidence, accepting the officer's version of the trip from Davenport, the spirit, if not the letter of Miranda and subsequent decisions has been violated here. I do not believe the state sustained the burden of showing defendant knowingly and intelligently waived his privilege against self incrimination and his right to have counsel present.

I doubt if the majority would have reached this result if defendant's crime had been less reprehensible. There is a natural tendency to make a tenuous finding of fact to avoid the application of a rule of law in a hard case. It seems to me the rule of law is unsound and that in the long run justice would best be served by applying it in accordance with its spirit and exposing the perverse result of its application.

I accept the statement of the law as set out in division I of the majority opinion, but cannot agree the evidence shows a knowing and intelligent waiver of the constitutional rights referred to therein.

Let us examine the circumstances under which defendant's incriminating statements were made. Defendant, an escapee from a mental institution with a deeply religious nature, called his attorney from Davenport. On advice of counsel he agreed to surrender himself to the Davenport police. Counsel advised the Des Moines police of these arrangements. After defendant turned himself in he talked to Mr. McKnight who advised defendant not to talk until he had talked with him. The officer heard that admonishment. The trial court found an agreement was made between defense counsel and police officials that defendant was not to be questioned on the return trip to Des Moines. Defendant was also advised by Mr. Kelly, a Davenport attorney, not to talk until he arrived in Des Moines. Mr. Kelly was denied permission to ride to Des Moines in the police car with defendant.

Captain Leaming, of the Des Moines city police, picked defendant up in Davenport. He testified that after he gave defendant the Miranda warnings, he reminded him he was represented by counsel and "that I wanted him to remember this because we would be visiting between here and Des Moines." He also stated defendant told him several times during the trip: "When I get to Des Moines and see Mr. McKnight I am going to tell you the whole story."

He also testified: "I did not question Mr. Williams on the ride to Des Moines; * * * that I had considerable conversation with Mr. Williams as to religion and what the people thought of him in Des Moines. * * *

"Well, Mr. Williams was very talkative, and he was asking me who we had talked to that were friends of his, if we talked to the Reverend from the church, if we talked to Mr. John Searcy, if we had checked for

fingerprints in his room at the YMCA, and we discussed religion. We discussed intelligence of other people. We discussed police procedures, organizing youth groups, singing, playing a piano, playing an organ, and this sort of thing.

"Eventually, as we were traveling along there, I said to Mr. Williams that, 'I want to give you something to think about while we're traveling down the road.' I said, 'Number one, I want you to observe the weather conditions, it's raining, it's sleeting, it's freezing, driving is very treacherous, visibility is poor, it's going to be dark early this evening. They are predicting several inches of snow for tonight, and I feel that you yourself are the only person that knows where this little girl's body is, that you yourself have only been there once, and if you get a snow on top of it you yourself may be unable to find it. And, since we will be going right past the area on the way into Des Moines, I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas eve and murdered. And I feel we should stop and locate it on the way in rather than waiting until morning and trying to come back out after a snow storm and possibly not being able to find it at all.'

"At that point Mr. Williams asked me why I should feel that we would be going right by it. I told him that I knew it was somewhere in the Mitchellville area and I didn't know exactly where, but I did know that it was somewhere in the Mitchellville area, and I felt that we should stop and look.

"I stated further, 'I do not want you to answer me, I don't want to discuss it any further. Just think about it as we're riding down the road.' * * *

"Well, we had further discussions about people and religion and intelligence and friends of his, and what people's opinion was of him and so forth. And, oh, some

distance still east of the Mitchellville turn-off he said, 'I am going to show you where the body is.' He said, 'How did you know that it was by Mitchellville?' I told him that this was just part of our procedure, that this was our job to find out such things and I just knew that it was in that area. * * *

"Q. Now let me ask you this: When you said to him, you say you said to him it's snowing out here, bad weather, isn't that what you said to him? A. Yes, sir.

"Q. He didn't ask you that, did he? A. No.

"Q. Didn't you say that to him to induce him to show you where the body was? A. I was hoping he would.

"Q. You was hoping he would? A. Yes, sir.

"Q. So you wanted to make it appear to him that it might be harder or impossible to get out there the next day, you told him there was going to come a big snow, didn't you? A. No, I didn't tell him there was going to come a big snow. I asked him to observe the weather, observe the visibility, observe it sleeting and it raining and they're predicting snow for tonight.

"Q. And that was for the purpose of inducing him to talk, wasn't it? A. Telling the truth.

"Q. Well, I said, wasn't that for the purpose of getting Mr. Williams to talk? A. Well, I was hoping he would tell me where the body was, Mr. McKnight, absolutely. * * *

"Q. In fact, Captain, whether he was a mental patient or not, you were trying to get all the information you could before he got to his lawyer, weren't you? A. I was sure hoping to find out where that little girl was, yes, sir. * * *

"Q. Well, I'll put it this way: You was hoping to get all the information you could before Williams got back to McKnight, weren't you? A. Yes, sir."

It seems to me the only reasonable conclusion is that Captain Leaming embarked on a psychological campaign to obtain as much information from this mentally weak defendant as possible before letting him talk to his counsel. The fact that he was able to get the information by implanting ideas in defendant's mind without direct questioning is unimportant. If it were not for the agreement made with defendant's counsel, I personally would have no objection to this technique. However, I believe the law to be otherwise. There was no claim of verbal waiver of counsel. I do not think it was shown by the totality of the circumstances.

The aspect of the case which gives me the most concern was the obvious effort of the police officers to evade the good faith attempt of defendant's counsel to cooperate with the police department. While I can understand and sympathize with Captain Leaming's desire to recover the little girl's body as soon as possible, actions like those taken here can only cause defense counsel to lose confidence in the trustworthiness of police officers and discourage reasonable and sound approaches to criminal practice.

In my opinion the majority position in State v. Hancock (1969, Iowa), 164 N.W. 2d 330, 337, has more application to this case than the majority is willing to concede. There defendant's counsel agreed to a polygraph test and its admissibility into evidence. Defendant signed a waiver of her constitutional rights in the presence of the operator. After the test was completed defendant under the urging of the operator made certain admissions. A majority of the court in a brief concurring opinion held the state overreached defendant in offering the testimony as to admissions made after the test. The Miranda waiver was not proper because it was taken in the absence of defendant's attorney after a limited stipulation for a different specific purpose.

I would not favor a rule which would make it impossible for a defendant to waive his constitutional rights in counsel's absence, but when counsel and police have agreed defendant is not to be questioned until counsel is present and defendant has been advised not to talk and repeatedly has stated he will tell the whole story after he talks with counsel, the state should be required to make a stronger showing of intentional voluntary waiver than was made here.

I would agree with the statement in State v. Johns (1970), 185 Neb. 590, 177 N.W.2d 580, 584–585:

"We hold that where the police or prosecutors know that a defendant, formally charged with a felony, is represented by counsel who has requested that no statements be taken from the defendant; and where the defendant, after being advised of his Miranda rights, has unequivocally asked for his attorney; statements deliberately elicited from the defendant by custodial interrogation designed to produce incriminating statements, and undertaken before the defendant has been given an opportunity to consult with his lawyer, are inadmissible, in the absence of an effective waiver.

"Where both the defendant and his counsel have previously attempted to invoke the defendants' constitutional right to counsel; then at the very least, a 'heavy burden' rests on the state to demonstrate that the defendant knowingly and intelligently waived his right to counsel. On the facts in this case, that burden was not met."

I believe this case must be reversed under the law as it now stands in the decisions of the United States Supreme Court.

RAWLINGS, Justice (dissenting).

In my opinion the facts set forth in Justice Stuart's dissent lead unalterably to the conclusion he reaches.

The statements made to defendant on the trip from Davenport to Des Moines were

nothing less than a species of subtle but effective persuasion.

Whether these statements by Officer Leaming be classified as declaratory or interrogatory in form, they were designed to elicit a statement or confession by defendant.

The inculpatory statements made by defendant as a result thereof should have been excluded.

In support hereof see Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242, and cases cited.

MASON AND BECKER, JJ., join in this dissent.