Robert Anthony **WILLIAMS** a/k/a Anthony Erthel **Williams**, Petitioner,

v.

Lou V. **BREWER**, Warden of the Iowa State Penitentiary at Fort Madison, Iowa, Respondent.

Civ. No. 72–257–2.

United States District Court, S. D. Iowa, C. D.

March 28, 1974.

Robert Bartels, Iowa City, Iowa, for petitioner.

Richard C. Turner, Atty. Gen., Richard N. Winders, Asst. Atty. Gen., Des Moines, Iowa, for respondent.

HANSON, Chief Judge.

## I.

The Court issues this Order pursuant to the Petition for Writ of Habeas Corpus filed by Robert Anthony Williams challenging his May 6, 1969 conviction of murder (§ 690.2, Code of Iowa 1966) in the District Court of Iowa in and for Polk County, Criminal No. 55805. The issues which Petitioner now is presenting to this Court were timely raised at the trial court level and on appeal to the Supreme Court of Iowa; the latter Court affirmed Petitioner's conviction in State v. Williams, 182 N.W.2d 396 (1971). Thus, there is no question that Petitioner has exhausted his available state remedies as required by 28 U.S.C. § 2254.

## II.

The central issue raised by Petitioner at trial, on appeal to the Supreme Court of Iowa, and in this Court, is whether certain statements made by Petitioner to a Des Moines police officer, Detective Leaming, during an automobile trip from Davenport, Iowa to Des Moines, Iowa—and other evidence and testimony obtained as a result of those statements —were properly admitted into evidence under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. In this Court, the attorneys for the State of Iowa and for the Petitioner agreed that the case would be submitted on the record of facts and proceedings in the trial court, without taking of further testimony. Based on its examination of that record, the Court makes the following findings of fact relative to the issues raised herein.

1. On December 24, 1968, a family by the name of Powers attended a wrestling tournament in the YMCA building in Des Moines, Iowa. When Pamela Powers, aged ten, failed to return from a trip to the restroom, a search was instituted, but she could not be found. YMCA personnel subsequently called the police. 182 N.W.2d at 399.

2. Suspicion rather quickly was focused on the Petitioner, who had left the YMCA in his automobile shortly after Pamela Powers' disappearance. On December 25, 1968, Petitioner's car was found in Davenport, Iowa, approximately 160 miles east of Des Moines, and a search was instituted for him in the Davenport area by the Davenport and Des Moines police and by the Iowa Bureau of Criminal Investigation. 182 N.W.2d at 399. At about this time, a warrant for Petitioner's arrest, on a charge of child-stealing, was issued and filed in Polk County. R. at 16, 108.

3. On the morning of December 26, 1968, Petitioner called his Des Moines attorney, Mr. Henry McKnight, from Rock Island, Illinois. Mr. McKnight advised Petitioner to surrender himself to the Davenport police. 182 N.W.2d at 406; R. at 67.

4. At approximately 8:40 a. m. on December 26, 1968, Petitioner did surrender himself to the Davenport police. He was placed under arrest and booked by the Davenport police. At 11:00 a. m. on the same day, Petitioner was arraigned before a state court judge in Davenport as a fugitive to be held on the Polk County warrant, and notified of the charges against him. R. at 16–17.

5. Following his telephone conversation with Petitioner on December 26, 1968, Mr. McKnight proceeded to the Des Moines Police Department, where he

talked to various officials, including Detective Leaming, about the Petitioner's proposed surrender and his subsequent transportation to Des Moines. 182 N.W.2d at 399, 406; R. at 10, 25, 128–29. While Mr. McKnight was at the Des Moines Police Department, he received a long distance telephone call from Petitioner, who at that time was in custody in Davenport. Mr. McKnight told Petitioner that he would be picked up in Davenport, that he would not be mistreated or grilled, that they would talk it over in Des Moines, and that Petitioner should make no statement until he reached Des Moines. 182 N.W.2d at 399, 406; R. at 11, 21, 67. Mr. McKnight's portion of this conversation was carried on in the presence of Chief of Police Wendell Nichols and Detective Leaming. 182 N.W.2d at 406; R. at 11, 25, 116, 130.

6. As a result of these conversations, it was agreed that Detective Leaming would go to Davenport to pick up Petitioner, without Mr. McKnight, and bring him directly back to Des Moines. R. at 11, 131. At this time there also was an agreement between Mr. McKnight and the police that the Petitioner would not be questioned until after he had returned to Des Moines and consulted with Mr. McKnight. R. at 34.

7. On December 26, 1968, Detective Leaming drove from Des Moines to Davenport to pick up the Petitioner; Detective Leaming was accompanied by Detective Arthur Nelson. 182 N.W.2d at 399; R. at 113.

8. While he was in Davenport, the Petitioner consulted with a local attorney, Mr. Thomas Kelly, about his situation. Petitioner had asked to talk with Mr. Kelly, and their conversations were carried on in the context of an attorney-client relationship. While Petitioner was in Davenport, Mr. Kelly in effect acted as his attorney. R. at 109–110, 67–68, 180–184. Mr. Kelly advised Petitioner to remain silent until he got to Des Moines and talked with Mr. McKnight. 182 N.W.2d at 406; R. at 23–24.

9. Detectives Leaming and Nelson arrived in Davenport at about noon on December 26. After meeting Mr. Kelly and being informed that Petitioner was eating lunch, Leaming and Nelson went to lunch. When they returned at approximately 1:00 p. m., they had some conversation with Mr. Kelly and Petitioner. At this time Detective Leaming gave Petitioner his *Miranda* warnings; these warnings were not repeated during the trip to Des Moines. When Detective Leaming gave these *Miranda* warnings, he told Petitioner that they would be "visiting" during the trip to Des Moines. 182 N.W.2d at 406; R. at 26, 114.

10. After the *Miranda* warnings referred to in the preceding paragraph were given, Petitioner again conferred privately with Mr. Kelly, whom Detective Leaming understood to be acting as Petitioner's attorney (in addition to Mr. McKnight). R. at 26–27, 114–115. After this conference, Mr. Kelly again spoke with Detective Leaming. Mr. Kelly told Detective Leaming that it was his understanding that Petitioner was not to be questioned until he got to Des Moines; when Detective Leaming expressed some reservations, Mr. Kelly stated that that understanding should be carried out. R. at 21, 182–83.

11. Before Detective Leaming left for Des Moines with the Petitioner, Mr. Kelly asked Detective Leaming that he be permitted to ride along in the police car to Des Moines. This request was refused by Detective Leaming. 182 N.W.2d at 406; R. at 183.

12. On several occasions during the trip to Des Moines, and after the aforementioned *Miranda* warnings were given in Davenport, Petitioner told Detective Leaming that he would talk to him *after* he returned to Des Moines and consulted with his attorney, Mr. McKnight. 182 N.W.2d at 406; R. at 27–28, 30, 33. The *Miranda* warnings were never repeated during the trip itself. R. at 133.

13. The Petitioner had been a patient at the State Mental Hospital at Fulton,

Missouri for three years prior to his escape on July 6, 1968. Petitioner also was a person of a deeply religious nature. These facts were known to the Des Moines police, including Detective Leaming, at the time the Petitioner returned to Des Moines from Davenport with Detective Leaming. 182 N.W.2d at 406; R. at 67, 119, 133, 148.

14. Following the giving of *Miranda* warnings by Detective Leaming, Petitioner did not state that he wished to waive his *Miranda* rights. In fact, as noted in Paragraph 12, *supra,* Petitioner indicated that he did not wish to talk on the trip by stating that he would talk *after* he got to Des Moines and spoke with Mr. McKnight. Nevertheless, while Detective Nelson drove, Detective Leaming carried on a conversation with Petitioner during the trip concerning religion, Petitioner's reputation, and various other topics, including Petitioner's friends, Petitioner's Reverend, a Mr. Searcy, whether the police had checked for fingerprints in Petitioner's room, the intelligence of other people, police procedures, organizing youth groups, singing, playing a piano, playing an organ, "and this sort of thing." 182 N.W.2d at 406–407; R. at 119. At about this time, Detective Leaming also testified that he told Petitioner that he did not hate him or wish to kill him; that "I myself had had religious training and background as a child, and that I would probably come more near praying for him than I would to abuse him or strike him"; and that he was a good police officer and would protect Petitioner and not allow anyone to molest or abuse him. R. at 118–19; T. at 222.

15. According to Detective Leaming's own testimony, the specific purpose of this conversation was to obtain statements and information from the Petitioner concerning the missing girl. In this regard, the following testimony by Detective Leaming on cross-examination during pre-trial proceedings in the Polk County District Court is particularly relevant:

Q. Now, when you left, just before you left, do you remember we had parted greetings and didn't you say, 'I'll go get him and bring him right back here to Des Moines'? A. Yes, sir.

Q. You said that to me, didn't you? A. Yes, sir.

Q. Knowing that you were dealing with a person from a mental hospital, did you say to him, you don't have to tell me this information, did you say that to him out there on the highway? A. What information?

Q. The information that he gave you, the defendant gave you, you didn't say that to him, did you? A. No, sir.

Q. In fact, Captain, whether he was a mental patient or not, you were trying to get all the information you could before he got to his lawyer, weren't you? A. I was sure hoping to find out where that little girl was, yes, sir.

\* \* \* \* \* \*

Q. Well, I'll put it this way: You were hoping to get all the information you could before Williams got back to McKnight, weren't you? A. Yes, sir.

R. at 136–37. *See also,* R. at 133–34, 135.

16. Detective Leaming specifically appealed to Petitioner's known religious nature in order to obtain statements from him concerning the whereabouts of the missing girl. The following testimony by Detective Leaming himself, describing what he said to the Petitioner, clearly sets out the approach which he used:

Eventually, as we were traveling along there, I said to Mr. Williams that, 'I want to give you something to think about while we're traveling down the road.' I said, 'Number one, I want you to observe the weather conditions, it's raining, it's sleeting, it's freezing, driving is very treacherous, visibility is poor, it's going to be dark early this evening. They are

predicting several inches of snow for tonight, and I feel that you yourself are the only person that knows where this little girl's body is, that you yourself have only been there once, and if you get a snow on top of it you yourself may be unable to find it. And, since we will be going right past the area on the way into Des Moines, I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas Eve and murdered. And I feel we should stop and locate it on the way in rather than waiting until morning and trying to come back out after a snow storm and possibly not being able to find it at all.'

R. at 120.

17. Following this statement, Petitioner asked why Detective Leaming felt that they were going past the body, and Detective Leaming told Petitioner that he knew the body was somewhere in the area of Mitchellville, a town near Interstate 80. Detective Leaming then stated, "I do not want you to answer me. I don't want to discuss it further. Just think about it as we're riding down the road." R. at 120–21.

18. In fact, Detective Leaming did not know that the body was near Mitchellville, and he made the statement to Petitioner specifically to induce Petitioner to tell him where the body was. R. at 135.

19. At some point east of Grinnell, Iowa, and after the conversation outlined in Paragraphs 14 and 17, *supra*, Petitioner asked if the police had found the victim's shoes. Without any further constitutional warnings, Detective Leaming discussed with Petitioner what evidence had been found, where Petitioner had put the shoes, and what the shoes looked like. A stop at a gas station where the shoes were supposed to be produced no results. 182 N.W.2d at 404; R. at 121–22.

20. Following this incident, there was some further discussion of a blanket; a stop at a rest area disclosed that the blanket already had been found. 182 N.W.2d at 404; R. at 122–23.

21. After the stop at the rest area, there was further discussion about "people and religion and intelligence and friends of [Petitioner's], and what people's opinion was of him and so forth." Then, "some distance still east of the Mitchellville turnoff," Petitioner stated that he would show the detectives where the body was. 182 N.W.2d at 404, 407; R. at 123.

22. Following Petitioner's statement, the police, including Detective Leaming, drove to a place indicated by Petitioner, where they located the body of Pamela Powers. 182 N.W.2d at 404; R. at 124–25, 145–47.

23. Although Detective Leaming's automobile was not equipped with a radio capable of reaching Des Moines during most of the trip, a state car which was following at all times was equipped with such a radio. This radio was in fact utilized to keep in touch with Chief Nichols. Chief Nichols was informed of the side trip to Mitchellville, but did not relay this information to Mr. McKnight. R. at 12–13, 150 (11, 20–23).

24. As noted above, Petitioner's statements of December 26, 1968, to Detective Leaming were admitted into evidence at Petitioner's trial, along with other evidence obtained pursuant to these statements, all over Petitioner's objections. 182 N.W.2d at 398–399.

Most of the facts found above are not disputed by either party. Specifically, there has been no dispute about the facts set out in Paragraphs 1 through 5, 7 through 9, and 12 through 24, *supra*. However, there was some dispute in the record, at oral argument, and in the briefs over some of the facts in the remaining Paragraphs (6, 10 and 11), and the Court deems it appropriate at this point to set out briefly how it resolved these disputes.

*First*, the State disputed whether an agreement was entered into by Detective Leaming with Petitioner's attorney that the Petitioner would not be questioned by the police on the return trip from Davenport (see Paragraph 6, *supra*). However, the Court finds this dispute easily resolved in light of the trial court's specific finding of fact that such an agreement did exist, and in light of that same Court's explicit doubts as to the testimony of Detective Leaming.[1]

*Second*, the State disputed whether Mr. Kelly, after conferring with Petitioner on an attorney-client basis, requested permission to ride to Des Moines with Petitioner and Detective Leaming (Paragraph 11, *supra*). Detective Leaming denied that there was such a request; both Petitioner and Mr. Kelly, who was a duly licensed member of the bar of Iowa, testified that there was. In light of Petitioner's obvious self-interest in the matter, the Court has discounted for the most part his testimony on this point. The Court has carefully reviewed the transcript of the testimony of Attorney Kelly and Detective Leaming. Taking the record of all the testimony in this case as a whole, the Court must reconcile discrepancies between the testimony of Detective Leaming and Mr. Kelly in favor of the Petitioner, and the Court so finds that there was a request by Mr. Kelly to accompany the Petitioner to Des Moines.[2] The Court has also resolved in Petitioner's favor the conflict in the record over whether Mr. Kelly told Detective Leaming that Petitioner was not to talk until after he reached Des Moines (see Paragraph 10, *supra*).

None of the preceding findings of fact conflicts with any of the factual findings made by the state trial court. The question remaining is whether the state courts correctly applied the law to the facts in permitting the challenged evidence to be admitted. The conclusion of this Court is that the evidence was improperly admitted and that Petitioner's request for release must be granted.

### III.

On the basis of the facts outlined above, Petitioner argues that both his Fifth and Sixth Amendment rights were violated when the statements described above were elicited from him during the Davenport-Des Moines trip with Detectives Leaming and Nelson. The Court begins with the Sixth Amendment argument.

Petitioner centers his claim of Sixth and Fourteenth Amendment violations around the case of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). In *Massiah*, the defendant had been indicted and was represented by counsel. In order to obtain incriminating statements from the defendant, the police arranged for an alleged accomplice of the defendant to meet with the defendant in the accomplice's car; the car was equipped with a radio transmitter which enabled a government agent to hear incriminating statements made by the defendant to the alleged accomplice; these statements were introduced at trial over the defendant's objections. The United States Supreme Court reversed the defendant's conviction, holding that the defendant's right to counsel under the Sixth Amendment had been violated when the government agents obtained his statements through deception and in the absence of counsel.

The *Massiah* opinion left open the question of the stages to which the Sixth Amendment right to counsel attaches. The Respondent has not challenged Petitioner's assertion that the automobile trip in question in this case was such a stage; nevertheless, some preliminary attention to this point is appropriate. In Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411

---

1. This finding by the trial court is amply supported by the testimony of Wendell Nichols, Chief of Police of Des Moines, and by the cross-examination of Detective Leaming.

2. The state court made no findings of fact on this issue, apparently because it regarded it as irrelevant to the admissibility of the challenged evidence.

(1972), the Supreme Court held that a Sixth Amendment right to counsel at a line-up exists only after "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." 406 U.S. at 689. Petitioner has suggested a large number of factors indicating the initiation of "adversary judicial criminal proceedings" prior to the automobile trip in question. Although the Court cannot agree with all of them, three factors do show conclusively that the *Kirby* test was met in this case: (1) an arrest warrant for Petitioner, charging him with child-stealing, had been issued in Polk County; (2) Petitioner was arrested on the warrant and booked in Davenport; and (3) Petitioner was arraigned in Davenport on the Polk County warrant.

█ Since the submission of this case, the Supreme Court has decided another case which further supports the conclusion that the Sixth Amendment guarantees outlined in *Massiah* apply to the instant situation. In United States, v. Ash, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), the Supreme Court held that a pretrial event is a "critical stage" at which the accused has a right to counsel when the accused requires aid in coping with legal problems *or* help in meeting his adversary in a confrontation-type situation. The Court explicitly held *Massiah* as falling within this analysis, because in that case "the accused was confronted by prosecuting authorities who obtained, by ruse and in the absence of defense counsel, incriminating statements." 413 U.S. at 311. Clearly, in this case also, Petitioner was protected by the right of counsel during the trip from Davenport to Des Moines.

█ This leaves the question of whether Petitioner's right to counsel was violated during that trip; the answer clearly is in the affirmative. Like the defendant in *Massiah*, Petitioner, not only had a right to counsel during the time in question, he actually had arranged for counsel. As in *Massiah*, the authorities used a ruse to obtain statements from the defendant in the absence of counsel: Detective Leaming obtained statements from Petitioner in the absence of counsel (1) after making, and then breaking, an agreement with Mr. McKnight that Petitioner would not be questioned until he arrived in Des Moines and saw Mr. McKnight; (2) after being told by both Mr. McKnight and Mr. Kelly that Petitioner was not to be questioned until he reached Des Moines; (3) after refusing to allow Mr. Kelly, whom Detective Leaming himself regarded as Petitioner's co-counsel, to ride to Des Moines with Petitioner; and (4) after being told by Petitioner that he would talk *after* he reached Des Moines and Mr. McKnight. By violating or ignoring these several, clear indications that Petitioner was to have counsel during interrogation, Detective Leaming deprived Petitioner of his right to counsel in a way similar to, if not more objectionable than, that utilized against the defendant in *Massiah*.[3]

█ Respondent, and Detective Leaming in his testimony in the state court record, have argued that Detective Leaming's "conversations" with Petitioner did not amount to "interrogation," apparently because Detective Leaming's initial statements to Petitioner did not end with a question mark. However, quite apart from the fact that Detective Leaming clearly did ask many questions of Petitioner concerning the whereabouts of the body (in the absence either of counsel or any mention by Detective Leaming of the availability of counsel), Detective Leaming's initial "statements" to Petitioner concerning the weather, the desirability of a Chris-

---

3. Recently the Eighth Circuit Court of Appeals in United States v. Stabler, 490 F.2d 345, 350 (1974), stated that a defendant's spontaneous confession was admissible. That case must be distinguished as completely inapposite to the present case, given the mental coercion and promptings of Detective Leaming after the Petitioner had been isolated from his attorneys.

tian burial for the victim, and Detective Leaming's "knowledge" that the body was near Mitchellville clearly amounted to interrogation. The statements explicitly encouraged incriminating responses, and by Detective Leaming's own admission, they specifically were *intended* to produce such responses. The "statements" by Detective Leaming were as much interrogation as the methods used in *Massiah,* and to hold them to be anything less would be to reach an absurd result purely on the basis of punctuation.

Although the *Massiah* decision adequately covers the Sixth Amendment issue in this case, the Court notes that at least two Circuit Courts of Appeal have found Sixth Amendment violations in similar situations in which government authorities have ignored demands by counsel that interrogation take place only in their presence. In United States ex rel. Magoon v. Reincke, 304 F.Supp. 1014 (D.Conn.1968), affirmed, 416 F.2d 69 (2d Cir. 1969), the defendant had been formally arrested and given *Miranda* warnings.

In a phone conversation, his attorney told the defendant's interrogators to cease interrogation until he arrived. This demand was ignored, and statements were obtained from the defendant in his counsel's absence. The District Court held that:

> [O]nce an attorney representing a suspected felon upon whom investigation has focused contacts the police officer in whose charge he is held and informs him that he does not want him interrogated further, to admit into evidence statements thereafter obtained from the accused by police interrogation in the absence of counsel violates the defendant's constitutional rights.

304 F.Supp. at 1019.

In Taylor v. Elliot, 458 F.2d 979 (5th Cir. 1972), cert. denied, 409 U.S. 885, 93 S.Ct. 117, 34 L.Ed.2d 142 (1972), police officers transporting the defendant from Dublin, Georgia to Birmingham, Alabama ignored the defendant's mother's statements, relaying advice from his attorney, that he was to make no statements until he arrived in Birmingham. The confession obtained by the officers during the trip was introduced into evidence at defendant's trial. The Court of Appeals reversed defendant's conviction, holding that the interrogation in the face of the officer's knowledge that defendant had counsel who was absent but who had instructed him not to make any statement violated the defendant's Sixth Amendment rights. 458 F.2d at 980. *See also,* Clifton v. United States, 341 F.2d 649 (5th Cir. 1965); United States v. Wedra, 343 F.Supp. 1183 (S.D.N.Y. 1972).

The above discussion has ignored one of the main thrusts of both the Respondent's argument and decisions of state courts in this case: that Petitioner waived his Sixth Amendment rights during the automobile trip in question. The Court's conclusion, more fully explicated in Section V, *infra,* that Petitioner clearly did not waive his Fifth or Sixth Amendment rights directly answers this argument. Moreover, given the factual context of this case, this Court is of the opinion that Petitioner could not effectively waive his right to counsel for purposes of interrogation in the absence of counsel (or at least notice to his counsel of the interrogation). *See,* McLeod v. Ohio, 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965); Mathies v. United States, 126 U.S.App.D.C. 98, 374 F.2d 312 (1967) (opinion by Burger, J.); United States ex rel. Magoon v. Reincke, *supra*; Taylor v. Elliot, *supra*; United States ex rel. Chabonian v. Liek, 366 F.Supp. 72 (E.D.Wis.1973); United States v. Durham, 475 F.2d 208 (7th Cir. 1973). When the police have agreed with the defendant's attorney that the defendant will not be questioned in the attorney's absence, when another attorney has asked to be with the defendant at a particular time and place, and when the defendant has repeatedly asserted his desire not to talk in the absence of coun-

sel, the police plainly should not be permitted to interrogate the defendant at all until further notice is given to his counsel. To hold otherwise would make it impossible for defense counsel fully to protect his client's rights without staying with him 24 hours a day. *See*, United States v. Wedra, *supra*, at 1184, 1186.

## IV.

We now turn to Petitioner's argument that the facts of this case show violations of the holdings in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L. Ed.2d 977 (1964), and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1965). In *Escobedo*, police officers resisted efforts by both the defendant and his counsel to have counsel present during interrogation; statements obtained from the defendant in the absence of counsel were admitted into evidence at his trial. The Supreme Court reversed, holding that when a person is in custody and suspicion has focused on him, he has a right to have counsel present during interrogation.

Petitioner clearly was in custody and suspicion clearly had focused on him when the automobile trip in question occurred, and *Escobedo* therefore applies. From this point, the analysis is strikingly similar to the *Massiah* analysis set out earlier in this opinion. Detective Leaming's actions in breaking his agreement with Mr. McKnight that Petitioner would not be questioned during the Davenport-Des Moines trip, in refusing to allow Mr. Kelly to ride along, and in ignoring Petitioner's statements that he would talk *after* he reached Des Moines were aimed at preventing the presence of counsel when he first talked with Petitioner with the express purpose of obtaining incriminating statements; this was a clear and direct violation of the *Escobedo* holding.[4]

Petitioner also has argued that the elicitation of statements from him during the trip from Davenport to Des Moines violated the standards set out in Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 12 L.Ed.2d 977 (1965). Petitioner does not seriously dispute that *Miranda* warnings were given to him, and this Court has found that these warnings were given by the Davenport police when Petitioner was placed under arrest, by the state court judge at the Davenport arraignment, and by Detective Leaming before the automobile trip began. Nevertheless, this Court is compelled to conclude that the standards set out in *Miranda* were violated by Detective Leaming's actions subsequent to the warnings.

The *Miranda* holding requires, as an initial matter, that before a person in custody is questioned by the police, he must be warned (1) that he has a right to remain silent; (2) that anything he says can be used against him in court; (3) that he has the right to the presence of an attorney; and (4) that if he cannot afford an attorney one will be appointed for him. But *Miranda* does not simply require these warnings and then permit interrogation to continue automatically. For example,

> [i]f the individual indicates. *in any manner*, at any time prior to or during questioning, that he wishes to remain silent, the *interrogation must cease*. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

384 U.S. at 473–474 (emphasis added).

██ According to Detective Leaming's own testimony, Petitioner on several occasions stated that he would talk about the case *after* he arrived in Des Moines and saw Mr. McKnight; and Mr. Kelly also told Detective Leaming that Petitioner was not to talk until he saw Mr. McKnight in Des Moines. All of these statements were made after the *Miranda*

---

4. Again, there is a question of waiver, which is dealt with in Section V, *infra*.

warnings were given when Detective Leaming first met Petitioner at 1:14 p.m.—warnings which were never repeated during the remainder of the trip. Clearly, Petitioner and Mr. Kelly indicated, not just "in any manner," but directly and explicitly, that Petitioner wished to remain silent during the automobile trip. Under *Miranda*, interrogation should have ceased; but Detective Leaming, with the specific intent to obtain incriminating statements, and with knowledge of Petitioner's background of mental illness, encouraged Petitioner to talk by playing on his sympathies and by talking about his own "knowledge" as to the location of the body. The fact that statements were obtained in this way eloquently illustrates the validity of the Supreme Court's conclusion in *Miranda* that "statement[s] taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." 384 U.S. at 474.

Quite apart from Detective Leaming's failure to cease interrogation after Petitioner expressed his desire to remain silent, his further failure to repeat the warnings at any time after his first meeting with Petitioner—and especially after Petitioner made his first incriminating statement—violated the *Miranda* holding. After outlining the warnings required before in-custody interrogation, the Supreme Court held that "[o]pportunity to exercise these rights must be afforded . . . throughout the interrogation." 384 U.S. at 479. In United States v. Nielson, 392 F.2d 849 (7th Cir. 1968), the defendant was arrested and given *Miranda* warnings; he was then offered a "waiver of rights" form by the interrogating officers. The defendant responded that "I am not signing anything . . . until I have occasion to talk to [my lawyer]." 392 F.2d at 851. When given the opportunity to call his lawyer, he said that "it could wait." He was then asked several questions, which he answered in the negative; these answers were then admitted into evidence at his trial. The Court of Appeals reversed the conviction, hold-

ing that when a defendant expresses a willingness to talk after expressing his desire to remain silent, *Miranda* requires that the police make further inquiry "before continuing the questioning to determine whether [the] apparent change of position was the product of intelligence and understanding or of ignorance and confusion." 392 F.2d at 853. This Detective Leaming clearly did not do.

■ Except for the fact that the absence of the defendant's attorney in *Nielson* apparently was voluntary on the defendant's part, while the absence of Petitioner's attorney in this case was not, *Nielson* clearly applies to this case. In the language of *Miranda*, Petitioner was not afforded an "[o]pportunity to exercise these rights . . . throughout the interrogation." At the very least, after Petitioner's first incriminating statements about the victim's clothing and then about the location of the body, Detective Leaming should have repeated the *Miranda* warnings, or otherwise made an effort to insure that Petitioner understood his rights, before continuing his questioning. And this would have been so even if Detective Leaming had not already preceded these statements with constitutionally improper interrogation.

The case of Mathies v. United States, 126 U.S.App.D.C. 98, 374 F.2d 312 (1967), also has some clear implications for this case. In *Mathies*, the defendant, with the approval of counsel, had executed an affidavit which exonerated a prisoner named Swann by incriminating the defendant. When the police were informed by Swann of this affidavit, they arranged for a confrontation involving Swann, the defendant, and the police. The defendant's counsel was not informed of the meeting; but the defendant was informed of his rights. At this confrontation, the defendant acknowledged the validity of the affidavit and reaffirmed his involvement in the crime. Although the Court of Appeals held that the defendant had not been prejudiced by the introduction of the af-

fidavit, since it was not the product of police misconduct and could have been authenticated at trial without evidence of the defendant's later acknowledgement, Chief Justice (then Circuit Judge) Burger's opinion stated unequivocally that it was improper for the police to interview the defendant in the absence of notice to his counsel, and noted that "[t]he prospective application of *Miranda* . . . plainly will require that such interviews can be conducted only after counsel has been given an opportunity to be present." 374 F.2d at 316 (n. 3). The record in this case clearly shows that Petitioner's attorneys, Mr. McKnight and Mr. Kelly, not only were not "given an opportunity to be present," but were purposefully prevented from being present.

As the Tenth Circuit has held in United States v. Thomas, 474 F.2d 110, 112 (1973), cert. denied, 412 U.S. 932, 93 S. Ct. 758, 37 L.Ed.2d 160 (1973):

> [o]nce a criminal defendant has either retained an attorney or had an attorney appointed for him by the court, any statement obtained by interview from such defendant may not be offered in evidence for any purpose unless the accused's attorney was notified of the interview which produced the statement and was given a reasonable opportunity to be present.

*See,* United States v. Durham, 475 F. 2d 208 (7th Cir. 1973).

### V.

The preceding analysis has not conflicted directly with that of the state trial court or the Supreme Court of Iowa—largely because it has ignored for the most part the issues on which these courts decided this case against Petitioner: waiver. The state trial judge, following a hearing on a motion to suppress, found "as a fact that the defendant did voluntarily give information to the officers and thus waived his right to have an attorney present during the giving of such information." R. at 35. The trial court's conclusion was based on "the time element involved in the trip, the general circumstances of it, *and*

*more importantly the absence on the Defendant's part of any assertion of his right or desire not to give information absent the presence of his attorney . . . ."* R. at 35 (emphasis added). After an independent review of the issue, and of the record, the Supreme Court of Iowa supported and upheld these conclusions. State v. Williams, 182 N.W.2d 396, 402 (Iowa 1969).

As it relates to the issue of waiver and whether there was a waiver, the Court has previously determined under the factual situation in this case that there could be no effective waiver, given the Sixth Amendment violation inherent in the breaking of the agreement not to interrogate and the other efforts by Detective Leaming to interrogate Petitioner in the absence of counsel. However, since waiver is relevant at least to the *Miranda* violation, and since the resolution of the issue of waiver in any event must be favorable to Petitioner, the Court now will proceed to an analysis of waiver in this case.

Under 28 U.S.C. § 2254(d), a "determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction" generally is given a presumption of correctness in a federal habeas corpus action. Consistent with this, this Court has given great deference to the findings of fact made by the trial judge in this case, and as has been noted previously, none of the findings of fact outlined in Section II, *supra,* conflicts with findings of fact made by that state court. However, on this record, this Court must agree with the dissenting opinion in State v. Williams, *supra*—and therefore disagree with the conclusion of the trial judge and of the Iowa Supreme Court majority that Petitioner waived his Fifth and Sixth Amendment rights during the trip from Davenport to Des Moines on December 26, 1968.

This failure to adopt the state courts' conclusions on the issue of waiver is based on three separate, though related, considerations. *First,* 28 U.S.C. §

2254 speaks of a presumption in favor of the state court's findings of *fact;* the issue of waiver, however, is one of *law.* The United States Supreme Court recently has recognized this very distinction in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In reversing the decisions of both the United States District Court and the Court of Appeals, the majority in *Biggers* answered the dissenters' criticism that they had not followed the lower courts' findings of fact by holding that where the issue is one not purely of fact, but of the *constitutional significance* of these facts, the usual presumption in favor of the lower courts' findings does not apply. In the instant case, the issue —waiver—similarly is one of the constitutional significance of essentially undisputed facts, and hence there is no presumption of validity of the state courts' conclusions on this issue.

■ *Second,* it appears clear from the state courts' articulation of their reasons for finding waiver that they applied the wrong constitutional standards in making that finding. The Court in *Miranda* explicitly held that:

If the interrogation continues without the presence of an attorney and a statement is taken, *a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel*

. . . .

An express statement that the individual is willing to make a statement *and* does not want an attorney followed closely by a statement *could* constitute a waiver. But a *valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.*

384 U.S. 436, 86 S.Ct. 1602 (emphasis added).

This strict standard of waiver in cases involving custodial interrogation such as *Miranda* and *Escobedo,* recently has been reaffirmed by the United States Supreme Court in Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

In this case, there is *nothing* in the record to indicate that Petitioner waived his Fifth and Sixth Amendment rights *except* the fact that statements eventually were obtained. The heavy emphasis by the trial court on the "absence . . . of any assertion of his right or desire not to give information absent the presence of his attorney" conflicts directly with the Supreme Court's holding that "a valid waiver will not be presumed simply from the silence of the accused after warnings are given." In short, *Miranda* makes it clear that it is the *government* which bears a heavy burden of affirmatively demanding his rights, even after the appropriate warnings have been given—but that is the burden which explictly was placed on Petitioner by the state courts.

■ Finally, under the proper standards for determining waiver, there simply is no evidence to support a waiver.[5] As noted in the preceding paragraph, there is no affirmative indication, other than the challenged statements themselves, that Petitioner did waive his rights. Moreover, the state courts' emphasis on the absence of a demand for counsel was not only legally inappropriate, but factually unsupportable as well, since Detective Leaming himself testified that Petitioner, on several occasions during the trip, indicated that he would talk *after* he saw Mr. McKnight. Both these statements and Mr. Kelly's statement to Detective Leaming that Petitioner would talk only after seeing Mr. McKnight in Des Moines certainly were assertions of Petitioner's "right or desire not to give information absent the presence of his attorney . . . ." Moreover, the

5. Thus, even if waiver were a question of fact, this Court's conclusion would be that the state courts' determination of waiver "is not fairly supported by the record . . . ." 28 U.S.C. § 2254(d)(8).

statements were obtained only after Detective Leaming's use of psychology on a person whom he knew to be deeply religious and an escapee from a mental hospital—with the specific intent to elicit incriminating statements. In the face of this evidence, the State has produced no affirmative evidence whatsoever to support its claim of waiver, and, a fortiori, it cannot be said that the State has met its "heavy burden" of showing a knowing and intelligent waiver of Fifth and Sixth Amendment rights.

This conclusion would be unavoidable even absent the initial agreement between Mr. McKnight and the police that Petitioner would not be questioned until he arrived in Des Moines. But that agreement, if it did not vitiate entirely the issue of waiver, clearly added to the already heavy burden of the State on that issue, and makes even more plain the failure of the State to demonstrate a waiver.

### VI.

One further argument of the Petitioner remains; that his confession was given involuntarily. Although the preceding findings of fact and conclusions of law already dispose of the case in Petitioner's favor, this Court believes it appropriate to deal also with this "voluntariness" claim. Preliminarily, it is useful to note that the state courts considered the issues of waiver and of voluntariness as a single issue to be decided on the "totality of the circumstances." [6] However, the Supreme Court recently has held that these are issues which, though related, are distinct. *See,* Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).[7]

In considering the issue of voluntariness solely on the state court record, and without further evidentiary hearings, this Court of course must, under 28 U.S.C. § 2254(d), "exercise caution . . . from determining factual questions anew . . . ." Iverson v. North Dakota, 480 F.2d 414, 426 (8th Cir. 1973). At the same time, the *Iverson* holding does not conflict with the well established rule that a court in reviewing a challenge to the voluntariness of a confession is to "examine the entire record and make an independent determination of the ultimate issue of voluntariness"—even in a habeas corpus case. Davis v. North Carolina, 384 U.S. 737, 741–742, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966). The Court of Appeals in *Iverson* simply held that on the record before the District Court in that case, it could not be held as a matter of law that the challenged confession was involuntary—and then remanded for further fact-finding proceedings. Iverson v. North Dakota, *supra,* at 426, 427.

It is the prosecution which bears the burden of demonstrating voluntariness, at least by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Although this Court does not disagree with any of the findings of *fact* made by the state trial court, based on an independent examination of the record which has accepted the State's version of contested facts, it cannot agree with the state courts that the State met its burden of showing that Petitioner's statements were voluntarily given. In reaching this conclusion, the Court has given particular attention to Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) In

---

6. [T]he Defendant did voluntarily give information to the officers and thus waived his right to have an attorney present".; "he voluntarily waived such right. . . ." R. at 35.

7. Briefly, the issue with regard to "waiver" is whether the accused understood his rights and intelligently and voluntarily waived

them, while the issue with regard to "voluntariness" is whether the accused's actions were the product of the free exercise of his will. The accused's knowledge of his rights is a factor to be considered in the totality of the circumstances surrounding voluntariness, but is not dispositive of the issue. Schneckloth v. Bustamonte, *supra.*

*Spano,* the defendant, after some eight hours of questioning, gave a confession; the confession was admitted at his trial, and the defendant was convicted. At the time of the questioning, the defendant had surrendered himself and had retained counsel. Following the instructions of his attorney, the defendant at first refused to answer questions, and asked to talk to his attorney; this request was denied. Eventually, a fledgling police officer named Bruno, a close friend of the defendant, was induced to tell the defendant (falsely) that his job would be placed in jeopardy if the defendant did not talk. The defendant then gave a statement. In reversing the conviction on the ground that the confession was involuntary the Supreme Court emphasized three main factors: (1) the police officers' denial of the defendant's requests to talk to his attorney; (2) the psychological approach characterized by "sympathy falsely aroused" by Bruno; and (3) the intent of the police to get a confession from the defendant. 360 U.S. at 323–324. Factors closely analogous to these are present in the instant case.

▮ *First,* Detective Leaming, although he did not deny during the automobile trip a direct request from Petitioner for his attorney, ignored his agreement with Mr. McKnight that Petitioner would not be questioned, refused Mr. Kelly permission to ride along in the car to Des Moines, and ignored Petitioner's several statements that he would talk *after* he saw his attorney. *Second,* Detective Leaming, with full knowledge of Petitioner's religious nature and history of mental illness, used a psychological approach which purposefully played on religion and on Petitioner's sympathies. Moreover, Detective Leaming admittedly was less than honest with Petitioner concerning his supposed knowledge that the victim's body was near Mitchellville. And *third,* Detective Leaming himself admitted that it was his specific purpose in talking to Petitioner to obtain incriminating statements from Petitioner before he had a

chance to reach Mr. McKnight. Added to these factors is the coercive atmosphere which is inherent in a counselless automobile ride with police officers.

Against these factors strongly pointing to involuntariness, there is very little evidence to sustain the State's burden of showing voluntariness. *Miranda* warnings were given; but they were given some time before the incriminating statements were obtained, and they were followed by several indications that Petitioner wished to talk only in the presence of his attorney. The state courts also placed some emphasis on the timing of the statements, and this is one area in which the state court record is not quite as clear as it might be. Nevertheless, Detective Leaming's own testimony shows that even before he spoke to Petitioner about the weather, the desirability of a "good Christian burial" for the victim, and his "knowledge" that the body was near Mitchellville, he and Petitioner discussed a large number of topics, including Detective Leaming's background and attitudes, Petitioner's friends, Petitioner's Reverend, a Mr. Searcy, whether the police had checked for fingerprints in Petitioner's room at the YMCA, religion, the intelligence of other people, police procedures, organizing youth groups, singing, playing a piano, playing an organ, "and this sort of thing." R. at 119. Whatever treatment these topics were given, discussion of all of them must have consumed a considerable amount of time. Following Detective Leaming's lengthy and purposeful plea about locating the body for burial purposes and his admittedly false statement about knowing that the body was near Mitchellville, Detective Leaming told Petitioner not to answer then, but to "think about it" as they were riding down the road. Finally, after the initial stop at Grinnell, but before Petitioner's statements about the location of the body, there was further conversation about "people and religion and intelligence and friends of his, and what people's opinion (sic) was of him and so forth." R. at 123.

As noted above, the trial record is not as clear as it might be with regard to the timing of Petitioner's incriminating statements vis-a-vis the conversations between Detective Leaming and Petitioner. However, the lack of perfect clarity is not sufficient to preclude a finding of involuntariness here. For one thing, it was the State's burden to show voluntariness, and therefore the State's burden to make timing clear if it was important. More significantly, it seems clear from Detective Leaming's own testimony about the amount of conversation which took place that Petitioner's statements could not have been made after too long a lull in that conversation. And most importantly, Detective Leaming's approach specifically was not designed to elicit an immediate response to a direct question. Rather, Detective Leaming *asked* Petitioner to wait before he answered and to "think it over," and in a very real sense the fact that Petitioner did so would only indicate the success of the interrogator's tactics. Finally, in light of the interrogator's approach, both with regard to the "Christian burial" and the "knowledge" that the body was near Mitchellville, it is not surprising that it was at a spot relatively near Mitchellville that Petitioner made his statements concerning the location of the body.

In short, there are many factors pointing strongly to involuntariness, and the State simply failed to meet its burden of showing voluntariness.

## VII.

The holding of this Court is that all of the incriminating statements elicited from Petitioner during the December 26, 1968, automobile trip from Davenport to Des Moines were obtained in violation of Petitioner's Fifth and Sixth Amendment rights, and hence evidence of these statements should not have been admitted at Petitioner's trial. Under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), trial court errors of constitutional dimension necessitate reversal of a criminal conviction unless it can be shown beyond a reasonable doubt that the error did not prejudice the defendant. Here, the prejudice is obvious, and hence Petitioner's requested relief should be granted.

This Court's decision does not touch upon the issue of what evidence, if any, beyond the incriminating statements themselves must be excluded as "fruit of the poisonous tree." Cf., Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Neither party to this action has raised this issue, and since the issue is neither necessary to a judgment of reversal nor an independent alternative ground for reaching that judgment, it will be left as a point for decision by the appropriate state court in the event that there is a re-trial of this case. However, insofar as the matter of the admission of certain portions of the evidence may be concerned which is "fruit of the poisonous tree," the Court cites Killough v. United States, 336 F.2d 929, 934 (D.C.D.C. 1964).

The granting of a writ of habeas corpus, particularly by a federal court, is always a serious matter; and it is made even more serious in this case by the apparent clarity with which the evidence in the record connects Petitioner, at least in some manner, with an especially reprehensible crime. At the same time, the very foundation of our social and political order is the rule of law, and while one may sympathize with Detective Leaming's desire to locate the victim's body, his actions clearly and grossly violated the fundamental guarantees which our Constitution and laws have set up to govern the conduct of those engaged in law enforcement activities. Although both his general approach and his failure to observe the dictates of the *Miranda* case would themselves necessitate reversal of the conviction in this case, Detective Leaming's breaking of the agreement with Mr. McKnight and his purposeful and deliberate efforts to isolate Petitioner from his attorneys in order to obtain information are of particular con-

cern to this Court. When the police and defendant's counsel have agreed that there will be no questioning in the latter's absence, when the defendant has been told by counsel not to say anything in his absence, and when the defendant repeatedly has stated his desire to remain silent until he sees his lawyer, the State must show much more than the fact that statements eventually were obtained in order to justify questioning of the defendant in the face of this assertion and reassertions of his constitutional right. To hold otherwise would not only fly in the face of legal precedent, it would also, as the dissent in State v. Williams, *supra*, pointed out, "discourage reasonable and sound approaches to criminal practice" by defense counsel. Indeed, to allow into evidence statements obtained as were the statements involved in this case might make it unethical for defense counsel to advise a client to surrender in his absence, or to ever leave his client's side after arrest. If the right to counsel is to be preserved in any meaningful sense, agreements between counsel and the police involving matters such as interrogation must be lived up to. Cf., Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L. Ed.2d 427 (1971).

In addition to the constitutional prohibition against interrogation by Detective Leaming under these circumstances, the Court believes there are ethical considerations in the elicitation and use of the confession of the Petitioner obtained outside the presence of Petitioner's attorney and without the attorney's consent and advice to his client and after Petitioner had counsel—appointed or retained. United States v. Thomas, *supra*, 474 F.2d at 111–112.

The Court has spent a great amount of time reviewing the record of the State District Court and the Iowa Supreme Court and finds itself in full agreement with the ably written dissent of the Iowa Supreme Court in State v. Williams, *supra*. This Court is ever mindful of the emotional impact of such a decision as has been rendered by this Court today. This Court, however, even in a case involving a heinous crime with overwhelming evidence of a criminal defendant's guilt must adhere to the tenets of a constitutional approach to criminal procedure which has its ultimate goal a fair trial sustaining the rule of law. This Court today does say that the Petitioner shall be either afforded a new trial or the State must appeal to test the Court's ruling or a writ will issue.

Accordingly, it is ordered that the Petition for Writ of Habeas Corpus is sustained.

It is further ordered that the writ for release from custody shall not issue for the period of sixty (60) days pending an appeal or the pursuit of a new trial by the State of Iowa. In the event of the pursuit of new trial without appeal, the writ shall not issue until judgment is made in the last court in which it is finally submitted.

It is further ordered that in the event an appeal is filed by the State of Iowa within sixty (60) days of this Order, the issuance of the writ shall be stayed pending the outcome of that appeal provided the appeal is diligently prosecuted by the State of Iowa.