Robert Anthony **WILLIAMS**, Appellant,

v.

Crispus **NIX**, Warden of the Iowa State Penitentiary, Appellee.

No. 82–1140.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 8, 1982.

Decided Jan. 10, 1983.

Rehearing and Rehearing En Banc
Denied March 15, 1983.

Certiorari Granted May 31, 1983.
See 103 S.Ct. 2427.

Robert Bartels, Tempe, Ariz., for appellant.

Thomas J. Miller, Atty. Gen. of Iowa, Thomas D. McGrane, Asst. Atty. Gen., Des Moines, Iowa, for appellee.

Before HEANEY, Circuit Judge, HENLEY, Senior Circuit Judge, and ARNOLD, Circuit Judge.

ARNOLD, Circuit Judge.

In *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the Supreme Court set aside the murder conviction of appellant Robert Anthony Williams because statements leading the police to the body of the victim had been obtained from Williams in violation of his Sixth and Fourteenth Amendment right to counsel. Williams was tried again, and evidence of the discovery of the body and its condition was again admitted against him, this time on the theory, suggested in a footnote in the Supreme Court's opinion, that "the body would have been discovered in any event," 430 U.S. at 407 n. 12, 97 S.Ct. at 1244 n. 12, even in the absence of the statements unconstitutionally obtained from the defendant. After the Supreme Court of Iowa affirmed the second conviction, *State v. Williams,* 285 N.W.2d 248 (Iowa 1979), defendant again sought federal habeas relief, which the District Court denied, *Williams v. Nix,* 528 F.Supp. 664 (S.D.Iowa 1981). Both

the Supreme Court of Iowa and the District Court adopted the "inevitable discovery" or "hypothetical independent source" exception to the exclusionary rule and upheld the second conviction on that basis, finding that the State had proved that the body would have been discovered in any event and that the police had not acted in bad faith in obtaining the excluded statements from defendant. We hold that the record cannot support a finding that the State proved the police did not act in bad faith. We therefore reverse, 528 F.Supp. 664, and remand with instructions that the writ issue unless the State commences proceedings to try defendant again within 60 days of this Court's mandate.[1]

### I.

On Christmas Eve 1968 the Powers family went to see a wrestling match at the YMCA in Des Moines. Pamela Powers, their ten-year-old daughter, excused herself to go to the bathroom. She did not come back. A little while later, Robert Anthony Williams, a resident of the YMCA, was seen leaving the building with a bundle wrapped in a blanket. Williams, a black man known as "Reverend," had escaped from a mental hospital in Missouri, where he had been a patient for three years, without the knowledge, presumably, of the Des Moines YMCA. Two days later, Pamela Powers's body was found in a ditch east of Des Moines, as a result of statements made by Williams to the police under circumstances to be fully described later. Williams was tried and convicted of deliberate, premeditated murder, and his conviction was affirmed by the Supreme Court of Iowa, *State v. Williams,* 182 N.W.2d 396 (Iowa 1970). On habeas, however, the District Court, *Williams v. Brewer,* 375 F.Supp. 170 (S.D.Iowa 1974), set this first conviction aside, and this Court, 509 F.2d 227 (8th Cir.1974), and the Supreme Court, *Brewer v. Williams, supra,* affirmed.

The Supreme Court's reasons for invalidating the first conviction are of course the law of this case and are an important part of the background necessary for an understanding of the issues that now arise on this habeas challenge to Williams's second conviction. The defendant, after leaving the YMCA in Des Moines on December 24, turned up in Rock Island, Illinois, two days later. He telephoned Henry McKnight, a lawyer in Des Moines, and McKnight advised him to turn himself in to the police in Davenport, Iowa. Williams did surrender in Davenport, and McKnight went to the police station in Des Moines to speak with the authorities there. "As a result of these conversations, it was agreed between McKnight and the Des Moines police officials that Detective Leaming [of the Des Moines police] and a fellow officer would drive to Davenport to pick up Williams, that they would bring him directly back to Des Moines, and that they would not question him during the trip." *Brewer v. Williams, supra,* 430 U.S. at 391, 97 S.Ct. at 1235. The Supreme Court then described what happened next, *id.* at 392–93, 97 S.Ct. at 1236–1237:

> The two detectives, with Williams in their charge, then set out on the 160-mile drive. At no time during the trip did Williams express a willingness to be interrogated in the absence of an attorney. Instead, he stated several times that "[w]hen I get to Des Moines and see Mr. McKnight, I am going to tell you the whole story." Detective Leaming knew that Williams was a former mental patient, and knew also that he was deeply religious.

> The detective and his prisoner soon embarked on a wide-ranging conversation covering a variety of topics, including the subject of religion. Then, not long after leaving Davenport and reaching the interstate highway, Detective Leaming delivered what has been referred to in the briefs and oral arguments as the "Christian burial speech." Addressing Williams as "Reverend," the detective said:

---

1. In addition to his attack on the inevitable-discovery doctrine, Williams advances six other grounds for setting aside his conviction. We express no view as to their merit. He also claims that the District Court should have dis-

qualified itself. We disagree. The District Court properly declined to recuse itself, for the reasons stated in Judge Vietor's memorandum filed June 11, 1981.

"I want to give you something to think about while we're traveling down the road.... Number one, I want you to observe the weather conditions, it's raining, it's sleeting, it's freezing, driving is very treacherous, visibility is poor, it's going to be dark early this evening. They are predicting several inches of snow for tonight, and I feel that you yourself are the only person that knows where this little girl's body is, that you yourself have only been there once, and if you get a snow on top of it you yourself may be unable to find it. And, since we will be going right past the area on the way into Des Moines, I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas [E]ve and murdered. And I feel we should stop and locate it on the way in rather than waiting until morning and trying to come back out after a snow storm and possibly not being able to find it at all."

Williams asked Detective Leaming why he thought their route to Des Moines would be taking them past the girl's body, and Leaming responded that he knew the body was in the area of Mitchellville—a town they would be passing on the way to Des Moines.[1] Leaming then stated: "I do not want you to answer me. I don't want to discuss it any further. Just think about it as we're riding down the road."

[1] The fact of the matter, of course, was that Detective Leaming possessed no such knowledge.

As the car approached Grinnell, a town approximately 100 miles west of Davenport, Williams asked whether the police had found the victim's shoes. When Detective Leaming replied that he was unsure, Williams directed the officers to a service station where he said he had left the shoes; a search for them proved un-

successful. As they continued towards Des Moines, Williams asked whether the police had found the blanket, and directed the officers to a rest area where he said he had disposed of the blanket. Nothing was found. The car continued towards Des Moines, and as it approached Mitchellville, Williams said that he would show the officers where the body was. He then directed the police to the body of Pamela Powers.

The Court then held that the use of Williams's statements against him violated his Sixth and Fourteenth Amendment right to the assistance of counsel. "Detective Leaming," it said, "deliberately and designedly set out to elicit information from Williams just as surely as—and perhaps more effectively than—if he had formally interrogated him.... [H]e purposely sought during Williams' isolation from his lawyers to obtain as much incriminating information as possible." *Id.* 430 U.S. at 399, 97 S.Ct. at 1240. The Court further held that Williams had not waived his right to counsel and that "so clear a violation of the Sixth and Fourteenth Amendments as here occurred cannot be condoned." *Id.* at 406, 97 S.Ct. at 1243. The judgment of this Court granting habeas corpus was affirmed.

It was in this setting that Williams was tried for the second time. This time the State did not offer his own statements in evidence against him, nor did it seek to show that the police had been led to the victim's body by the defendant. The prosecution did, however, introduce evidence of the discovery of the body and various articles of the victim's clothing, including photographs and results of scientific tests. An evidentiary hearing on defendant's motion to suppress this evidence was held by the District Court of Polk County, Iowa.[2] The evidence was incontestably discovered as a direct result of defendant's unconstitutionally obtained statements, so it was, absent some exception, clearly excludable as "fruit of the poisonous tree." The State argued that the evidence would have been discovered in any event, and cited a footnote in the Supreme Court's opinion:

**2.** The case was later transferred to Linn County for trial on defendant's motion for change of venue.

[12] The District Court stated that its decision "does not touch upon the issue of what evidence, if any, beyond the incriminating statements themselves must be excluded as 'fruit of the poisonous tree.'" 375 F.Supp. 170, 185. We, too, have no occasion to address this issue, and in the present posture of the case there is no basis for the view of our dissenting Brethren, *post,* [430 U.S.] at 430 [97 S.Ct. at 1255] (White, J.); *post,* at 441 [97 S.Ct. at 1261] (Blackmun, J.), that any attempt to retry the respondent would probably be futile. While neither Williams' incriminating statements themselves nor any testimony describing his having led the police to the victim's body can constitutionally be admitted into evidence, evidence of where the body was found and of its condition might well be admissible on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited from Williams. *Cf. Killough v. United States,* 119 U.S.App.D.C. 10, 336 F.2d 929. In the event that a retrial is instituted, it will be for the state courts in the first instance to determine whether particular items of evidence may be admitted.

430 U.S. at 406–07 n. 12, 97 S.Ct. at 1243–44 n. 12.

The state trial court denied the motion to suppress, and held admissible articles of clothing, and photographs of articles of clothing, found on the body, evidence concerning the condition of the body, and the results of medical, chemical, or pathological tests performed on the body. The court found that the State had proved by a preponderance of the evidence that the body would have been discovered in any event, because a police search for the body would have continued, and the body would have been found in substantially the same condition in which it was found. Freezing temperatures, the court found, would have preserved the body from decomposition even

into April of 1969. *State v. Williams,* No. CR 55805 (Dist.Ct. Polk County, Iowa, May 31, 1977), found in Appendix filed in *State v. Williams,* No. 61228 Crim. (Sup.Ct. Iowa, App. filed July 31, 1978), p. 137.[3]

The case then went to trial, and the disputed evidence was introduced against defendant. The defense conceded that Williams had left the YMCA with the little girl's body, but claimed that someone else had killed her and placed her body in Williams's room in the hope that suspicion would focus on him. Williams, the theory went, then panicked, fled, and hid the body by the side of a road, until he came to his senses and gave himself up two days later. The theory is not so far-fetched as it sounds. The State contended that the murder was related to sexual abuse of the victim, and in fact acid phosphatase, a component of semen, was found in her body. But no traces of spermatozoa, living or dead, were found either in the body or on Pamela's clothing. One inference that could be drawn is that the victim was attacked by a sterile male. Williams is concededly not sterile. The State's witnesses suggested that sperm, initially present, had been destroyed by freezing, but this theory was arguably inconsistent with the hypothesis, earlier urged and accepted in connection with the motion to suppress, that extreme cold would preserve the body's condition, not change it. The defense called experts who testified that freezing would not destroy sperm cells. In addition, although pubic hairs said by an FBI expert to be "like" those of the defendant were found on the victim's clothing, so were other pubic hairs concededly belonging neither to Williams nor to the victim.[4] In any event, the jury found defendant guilty of first-degree murder, and he was sentenced to life in prison. He has been in the Iowa State Penitentiary since his first conviction in 1969.

3. This Appendix will be referred to in this opinion as "App."

4. We do not reach defendant's claim that the evidence of premeditation and deliberation was constitutionally insufficient under *Jackson v.*

*Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We mention some of the factual disputes at trial only to show that defendant's guilt is not undisputed.

On appeal, the Supreme Court of Iowa again affirmed. It held that there is in fact a "hypothetical independent source" exception to the exclusionary rule. The exception was stated as follows:

> After the defendant has shown unlawful conduct on the part of the police, the State has the burden to show by a preponderance of the evidence that (1) the police did not act in bad faith for the purpose of hastening discovery of the evidence in question, and (2) that the evidence in question would have been discovered by lawful means.

*State v. Williams*, 285 N.W.2d 248, 260 (Iowa 1979). As to the first element, the Court stated:

> The first question, then, is whether the police acted in bad faith for the purpose of hastening discovery of the body of Pamela Powers. While there can be no doubt that the method upon which the police embarked in order to gain Williams's assistance was both subtly coercive and purposeful, and that its purpose was to discover the victim's body, *see* 430 U.S. at 393, 399, 97 S.Ct. at 1236–37, 1240, 51 L.Ed.2d at 433, 437, we cannot find that it was in bad faith. The issue of the propriety of the police conduct in this case, as noted earlier in this opinion, has caused the closest possible division of views in every appellate court which has considered the question. In light of the legitimate disagreement among individuals well versed in the law of criminal procedure who were given the opportunity for calm deliberation, it cannot be said that the actions of the police were taken in bad faith.

*Id.* at 260–61. As to the second element, the trial court's finding that the body "would have been found in essentially the same condition it was in at the time of the actual discovery," *id.* at 262, even in the absence of assistance from the defendant, was approved.

## II.

■ Our analysis of this case makes it unnecessary to decide whether to recognize the inevitable-discovery or hypothetical-independent-source exception to the rule excluding evidence obtained in violation of the Sixth Amendment right to counsel. We assume *arguendo* that there is such an exception and that the opinion of the Supreme Court of Iowa in this case correctly states the requirements for establishing it. The exception as thus stated requires the State to prove two things: that the police did not act in bad faith, and that the evidence would have been discovered in any event. We hold that the State has not met the first requirement. It is therefore unnecessary to decide whether the state courts' finding that the body would have been discovered anyway is fairly supported by the record.[5] It is also unnecessary to decide whether the State must prove the two elements of the exception by clear and convincing evidence, as defendant argues, or by a preponderance of the evidence, as the state courts held.

■ The state trial court, in denying the motion to suppress, made no finding one way or the other on the question of bad faith.[6] Its opinion does not even mention the issue and seems to proceed on the assumption—contrary to the rule of law later laid down by the Supreme Court of Iowa— that the State needed to show only that the body would have been discovered in any event. The Iowa Supreme Court did ex-

---

5. At the oral argument the question whether the bad-faith element of the test might be dispensed with was raised from the bench, but counsel for the State expressly disclaimed any such position. We agree with counsel and with the Supreme Court of Iowa that if there is to be an inevitable-discovery exception the State should not receive its benefit without proving that the police did not act in bad faith. Otherwise the temptation to risk deliberate violations of the Sixth Amendment would be too great, and the deterrent effect of the exclusionary rule reduced too far. The Supreme Court's footnote in *Brewer v. Williams* makes no reference to a bad-faith prong of the test, but we do not read the footnote as intended to be a full-dress statement of the inevitable-discovery exception and its requirements. The footnote does not even establish that there is such an exception (though it may imply it), and the Court in a later case, *United States v. Crews*, 445 U.S. 463, 475 n. 22, 100 S.Ct. 1244, 1252 n. 22, 63 L.Ed.2d 537 (1980) (plurality opinion), found it unnecessary to address the issue.

6. The District Court's opinion denying habeas corpus does not discuss the bad-faith question explicitly.

pressly address the issue, in words that we have quoted, and a finding by an appellate court of a state is entitled to the same presumption of correctness that attaches to trial-court findings under 28 U.S.C. § 2254(d). *Sumner v. Mata,* 449 U.S. 539, 545–47, 101 S.Ct. 764, 768–769, 66 L.Ed.2d 722 (1981). We conclude, however, that the state Supreme Court's finding that the police did not act in bad faith is not entitled to the shield of § 2254(d), for two reasons. First, the Iowa court's discussion of bad faith is not really a finding of fact at all. It is more like a legal conclusion that police conduct later found constitutionally blameless by a large minority of this Court and the Supreme Court cannot amount to bad faith. To put it another way, if four Supreme Court Justices believe something, it must be reasonable.[7] And if the bad-faith passage in the Supreme Court of Iowa's opinion is regarded as a finding of fact that Detective Leaming, though he later turned out to be wrong, honestly believed that his conversation with Williams was not a violation of the Sixth Amendment, the finding must still be rejected. It is utterly without record support, for reasons that we shall explain later in some detail. The finding (if that is what it is) is thus "not fairly supported by the record," and paragraph (8) of § 2254(d) permits us to examine the bad-faith question unhampered by any presumption.[8]

If the state court's opinion is read as holding as a matter of law that Detective Leaming did not act in bad faith because one judge of this Court (or three, if the votes to grant rehearing en banc are counted) and four members of the Supreme Court later voted not to exclude the fruits

of his effort, then we respectfully disagree with the Supreme Court of Iowa. An opinion of the Supreme Court is no less declaratory of the law of the land when a bare majority joins it. The majority rules, in courts as in legislatures, and one vote is a decisive margin. Law is an art, not a science, and it often happens, especially in cases complex and important enough to attract the Supreme Court's attention, that questions of great moment do not receive unanimous answers. We note that the Supreme Court's opinion refers to Detective Leaming's conduct as *"so clear* a violation of the Sixth and Fourteenth Amendments . . . [that it] cannot be condoned." 430 U.S. at 406, 97 S.Ct. at 1243 (emphasis supplied). There is a sense, we suppose, in which a case decided by one vote is anything but "clear," but we judges of an inferior court are not permitted such speculation.

It is true that a proposition of law subscribed to by four Supreme Court Justices (or perhaps even one) must in some fashion be objectively "reasonable," but that does not meet the issue presented here. The question before us is not whether the Supreme Court's opinion in *Brewer v. Williams* is fairly debatable as a legal matter. Obviously it is. The question is rather what was in Detective Leaming's mind during that car ride back to Des Moines. If he honestly thought he was not violating Williams's rights, then the deterrent purpose of the exclusionary rule would arguably not be impaired by allowing proof of facts that would have come to light in any event. But if he had no such honest belief, and if the courts later hold his conduct unlawful, it matters not how close the division was among the judges. The relevant question—

---

**7.** This Court and the Supreme Court are not alone in being divided on this case. On the first appeal, the Supreme Court of Iowa affirmed Williams's conviction by a vote of five to four. *State v. Williams,* 182 N.W.2d 396 (Iowa 1970).

**8.** The State suggests that *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), precludes federal habeas review of the admission of evidence regarding the body. We disagree for several reasons. We read *Stone* as limited to Fourth Amendment claims, and the

Supreme Court's opinion in *Brewer v. Williams* supports that reading. In fact, the dissenting opinion of the Chief Justice, 430 U.S. at 415, 420–29, 97 S.Ct. at 1247, 1250–55, argues, citing *Stone,* that federal habeas review of the claim that evidence should have been excluded should not be available—a position that the Court necessarily rejected. And the State itself, Brief of Appellee p. 28, seems to concede that *Stone* would in any event bar federal habeas only if a lack of bad faith has been shown.

bad faith—is subjective. Possibly if Detective Leaming testified that he thought he was behaving constitutionally, and later the courts unanimously decided otherwise, based on clear preexisting law, the very clarity of the courts' action might be thought to cast a doubt on the truthfulness of the testimony. Could a proposition so lacking in legal support actually have been believed by an officer of the law?, one might ask. But that is not this case. Here, the question is the reverse: Does the closeness of a later judicial decision necessarily establish that conduct approved by a minority of judges is not in bad faith? We think not. If Leaming conversed with Williams in deliberate violation of the Sixth Amendment, the evidence must be excluded.

We turn, then, to the factual question of Leaming's state of mind at the time. On this question the State concededly has the burden of proof. If the evidence is in equipoise, or if there is no evidence either way, the State must lose. Yet there is not a line of evidence in the record before us that Detective Leaming thought he was within the Constitution. No court, state or federal, has ever so found, and it is not hard to see why, given the state of this record. We do not even have a self-serving statement from Leaming himself that he was unaware of any constitutional violation.[9]

The opinions of the Supreme Court and of the various concurring Justices in *Brewer v. Williams* furnish some fairly strong clues as to how that Court might resolve the bad-faith issue (though footnote 12 of the Court's opinion must mean that that issue, like other aspects of the inevitable-discovery doctrine, was to be open for exploration at the second trial and subsequent post-conviction proceedings). Not only does the Court refer to the Sixth Amendment violation as "clear," 430 U.S. at 406, 97 S.Ct. at 1243. It also describes Leaming's course of conduct as undertaken "deliberately," "designedly," and "purposely," *id.* at 399, 97 S.Ct. at 1239, and labels the situation before it as "constitutionally indistinguishable from" a previous Supreme Court decision, *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). The Court did not think it was breaking new ground, or holding Detective Leaming to a standard of conduct not theretofore clearly established.

Justice Marshall, concurring, stated that "there can be no doubt that Detective Leaming consciously and knowingly set out to violate Williams' Sixth Amendment right to counsel and his Fifth Amendment privilege against self-incrimination,[10] as Leaming himself understood those rights." *Id.* 430 U.S. at 407, 97 S.Ct. at 1244. Justice Powell, concurring, remarked that "the entire setting was conducive to the psychological coercion that was successfully exploited." *Id.* at 412, 97 S.Ct. at 1246. He took the position, at least as to Fourth Amendment violations, that "a distinction should be made between flagrant violations by the police, on the one hand, and technical, trivial, or inadvertent violations, on the other," but emphasized that "[h]ere, we have a Sixth Amendment case and also one in which the police deliberately took advantage of an inherently coercive setting in the absence of counsel, contrary to their express agreement. Police are to be commended for diligent efforts to ascertain the truth, but the police conduct in this case plainly violated [Williams's] constitutional rights." *Id.* at 413–14 n. 2, 97 S.Ct. at 1246–47 n. 2. And Justice Stevens, concur-

---

**9.** Leaming did not testify at the second trial or at the motion-to-suppress hearing held after the Supreme Court set aside the first conviction. Nor did any other witness testify as to his motivation. There was also no testimony by Leaming at the evidentiary hearing before the District Court on the second habeas petition. Leaming did testify at the motion-to-suppress hearing before the first trial, but the record before us contains only three pages of this testimony, see App. 125–27, and they do not

concern the witness's state of mind vis-a-vis Williams's constitutional rights. The transcript of the first trial and of the motion-to-suppress hearing that preceded it is not before us, but we feel sure that if it contained testimony tending to show Leaming's lack of bad faith the State would have called it to our attention.

**10.** The Court's opinion did not reach the Fifth Amendment issue.

ring, observed that "the State cannot be permitted to dishonor its promise to this lawyer." *Id.* at 415, 97 S.Ct. at 1247 (footnote omitted).[11]

Our study of the record confirms these hints in the opinions of the Justices in the majority. Not only has the State not borne its burden of proof; what evidence there is on the subject strongly points in the direction of bad faith. In the first place, every court, state or federal, that has made a finding on the issue has found that the police broke an express promise to Henry McKnight, Williams's Des Moines lawyer. The trial court so found before the first trial, see *State v. Williams, supra,* 182 N.W.2d at 402; *id.* at 406 (Stuart, J., dissenting); the District Court so found in the first habeas proceeding, *Williams v. Brewer, supra,* 375 F.Supp. at 173; and by the time the case reached this Court for the first time the breach of the agreement was no longer in dispute, *Williams v. Brewer, supra,* 509 F.2d at 229; *id.* at 236 n. 1 (Webster, J., dissenting). The word of the police, like that of everyone else, should be good. The broken promise might be justified if Detective Leaming was hoping (after two days of exposure to freezing temperatures) to find the victim alive. But Leaming did not so testify, and, though it could not be known that Pamela was dead, any hope of finding her alive must have been forlorn. In any event, McKnight had told Leaming that after he and Williams had had a chance to confer in Des Moines the police would be told where to find the body. Leaming did not wish to wait. Instead, as we said on the prior appeal, "the specific purpose of ... [Leaming's] conversation with ... [Williams] was to obtain statements and information from ... [him] concerning the missing girl before ... [he] could consult with Mr. McKnight." 509 F.2d at 231. Leaming wanted, it seems, not merely to find Pamela or her body, but also to obtain statements from Williams that might be used against him. See 430 U.S. at 408, 97 S.Ct. at 1244 (Marshall, J., concurring); 375 F.Supp. at 179.

At the oral argument the State did not question that Leaming broke his word, or that he deliberately and designedly set out to elicit information from Williams. It suggested, though, that deliberately seeking information is different from deliberately violating constitutional rights. Doubtless this is true as a matter of abstract logic. But several aspects of this record are inconsistent with such a reconstruction of Leaming's motivation. The promise not to question Williams was not the only promise broken. Leaming also promised McKnight to bring Williams straight to Des Moines, see 430 U.S. at 391, 97 S.Ct. at 1235, and this promise also was not kept. Leaming seems to have decided to break his promise not to question Williams almost immediately after the promise was made. Upon arriving in Davenport to pick Williams up, and before beginning the return trip, Leaming told his prisoner that " 'we'll be visiting between here and Des Moines.' " *Ibid.* Thereafter, Williams's Davenport counsel, a lawyer named Kelly, reminded Leaming of his commitment, but "Leaming expressed some reservations." *Id.* at 392, 97 S.Ct. at 1236. Kelly asked to be allowed to ride back in the car with his client, but this request was refused. Then, in the car, Leaming told Williams that he knew the body was in the area of Mitchellville, although "[t]he fact of the matter, of course, was that Detective Leaming possessed no such knowledge." *Id.* at 393 n. 1, 97 S.Ct. at 1236 n. 1. We do not wonder that the Supreme Court of Iowa described these tactics as "both subtly coercive and purposeful," 285 N.W.2d at 260, and that the trial court, in its opinion on the motion to suppress made before the second trial, referred to the "U.S. Supreme Court's findings that ... [the Christian burial] speech was a sly and clever psychological ploy, *designed for mental coercion of the defendant ...*." App. 136–37 (emphasis supplied). The State seems not to have asked the trial

---

11. *But see* 430 U.S. at 439, 97 S.Ct. at 1260 (Blackmun, J., dissenting) (an intention to find out where the little girl was "does not equate with an intention to evade the Sixth Amendment.") (footnote omitted).

court to make a finding on the issue of bad faith, and, as we have noted, it did not do so. This quotation from its opinion may indicate what that finding would have been. A design to obtain incriminating evidence by mental coercion is a design to violate the Constitution.

Nor is this a case where the police, having successfully devised a means of obtaining evidence, then forthrightly admitted the facts and defended the legality of their own conduct. On the contrary, Leaming disputed the claim that he had agreed with McKnight not to question Williams on the way back to Des Moines. He also contradicted Kelly's testimony that he had been refused permission to ride back with Williams, and that he had told Leaming that Williams was not to talk with him until they reached Des Moines. The District Court in the first habeas case explicitly resolved these three conflicts in testimony against Leaming, 375 F.Supp. at 176, 177, and the state trial court found as a fact, contrary to Leaming's testimony, that the agreement with McKnight had been made, and expressed "explicit doubts as to the testimony of Detective Leaming." *Id.* at 176 (footnote omitted). These are not the actions of a man who believed he was doing the right thing, only to be confounded later on by a close vote on a question of law.

We hold that the State did not satisfy its burden of proving by a preponderance of the evidence that the police did not act in bad faith in obtaining Williams's statements that led them to the body. Under the inevitable-discovery rule as laid down by the Supreme Court of Iowa, which we accept *arguendo* for the purposes of this appeal, the motion to suppress should have been granted. Williams's conviction was obtained in violation of the Sixth Amendment, and it must be set aside.

### III.

It will inevitably be remarked that our opinion focusses more on the conduct of the police than of the alleged murderer. If Williams is indeed guilty, and if he goes free as a result of our holding, then complete justice may not have been done, even though Williams has served 14 years in prison. A system of law that not only makes certain conduct criminal, but also lays down rules for the conduct of the authorities, often becomes complex in its application to individual cases, and will from time to time produce imperfect results, especially if one's attention is confined to the particular case at bar. Some criminals do go free because of the necessity of keeping government and its servants in their place. That is one of the costs of having and enforcing a Bill of Rights. This country is built on the assumption that the cost is worth paying, and that in the long run we are all both freer and safer if the Constitution is strictly enforced.

The judgment of the District Court is reversed. This cause is remanded to it with directions to issue the writ of habeas corpus releasing Williams from custody, unless the State within 60 days of the issuance of our mandate commences proceedings to try Williams again. Our action is also without prejudice to the right of the appropriate authorities of the State of Iowa to commence a civil-commitment proceeding against appellant.

It is so ordered.

### OPINION ON PETITION FOR REHEARING

The Court has before it the petition for rehearing filed by the appellee, directed to the panel that heard this appeal. The petition is denied.[1]

We deem it appropriate to add a few limited comments with respect to some of the arguments made for the first time in the petition for rehearing.

1. The State argues that the inevitable-discovery exception to the rule excluding evidence obtained in violation of the Sixth

---

**1.** Appellee also filed a petition for rehearing en banc, which is being denied in a separate order entered today.

Amendment should be available to it even if the police conduct in this case was in bad faith. (It does not argue that this Court's holding, on the record presently before it, that the State had not proved a lack of bad faith, was erroneous.) As already indicated in our opinion filed January 10, 1983, *Williams v. Nix*, 700 F.2d 1164 (8th Cir.1983), this argument is contrary to an express concession made by the State at the oral argument before us.[2] In the course of the oral argument, counsel for the State stated, Tr. 20, that "I really don't argue with the application of the good faith rule." A few minutes later, a member of the Court brought the matter up again, and the following colloquy occurred:

> Judge Arnold: Let me go back a minute, Mr. McGrane, and read to you what I wrote down that you said a minute ago. I want to see if you really meant this. "I really don't argue with the application of the good faith rule."

> Mr. McGrane: Well, I think I'm in a position here where I'm trying to argue for the Iowa Supreme Court's dissertation on the exclusionary rule. I think it's an exceptional analysis and dissertation on the rule and they apply the good faith rule. So I think that the lack of bad faith is where it would hurt us, but I think the lack of bad faith rule should be included. Does that answer the question, I hope.

> Judge Arnold: Yes, sir, it does.

> Mr. McGrane: I'd like to leave it in there and I'd like to have this Court find that in fact there was a lack of bad faith.

Both because of this concession, and because to hold otherwise would impermissibly reduce the deterrent effect of the exclusionary rule, see our previous opinion at p. 1169, n. 5, we adhere to our holding that the State, in order to avail itself of the inevitable-discovery exception, should have to prove by a preponderance of the evidence that the police did not act in bad faith.

■ 2. The State also suggests that even if lack of bad faith must be shown, the appropriate standard is objective, not subjective. That is, was the conduct of the police objectively reasonable? Again, we adhere to our previous view that the important question is the state of mind of the police officer at the time that the conduct later held to be unconstitutional occurred. Since the purpose of the exclusionary rule is to deter unconstitutional conduct, exceptions to the rule should not be permitted unless the police honestly believed that they were not behaving unconstitutionally. Again, an exchange between the bench and counsel for the State during oral argument is relevant.

> Judge Henley: Is it a question of what he did or what he thought he did?

> Mr. McGrane: I think it's what he thought he was doing. That's good faith.

Tr. 21. See also Tr. 18 (Mr. McGrane: "That's not bad faith because he thought the way he was doing it was legal.")

■ 3. Finally, the State argues that to impose a good-faith requirement at this point in the case is unfair to it. At the time of the hearing on the motion to suppress before the second trial, it says, no one knew that lack of bad faith was relevant, and therefore the State made no attempt to prove this element of the inevitable-discovery exception. It is unfair, the argument runs, for this Court now to hold the conviction invalid on the basis of an issue as to which the State has never been allowed to present proof. The suggestion is made that some kind of remand take place for a hearing, either in the District Court or in the state courts, at which the State would be allowed to attempt to show that no bad faith was involved.

We respectfully disagree with this suggestion for several reasons. The bad-faith question came into the case, in so many words, when the Supreme Court of Iowa decided the appeal from the second convic-

---

**2.** A transcript of the tape of the oral argument has been prepared, and copies have been furnished to counsel. The Clerk is directed to file the transcript as part of the records of this case.

tion. It was the Supreme Court of Iowa, not this Court, that brought the bad-faith issue into the case. It is the opinion of the Supreme Court of Iowa that first pointed out the crucial nature of the issue. No complaint was made by the State at that time that a new issue had been unfairly raised. The opinion of the District Court also mentions the absence of bad faith as one element of the inevitable-discovery doctrine, and again neither side claimed that the question was being unfairly injected into the case.

On the appeal to this Court, both sides briefed the good-faith issue. The State's brief did not argue that it had never had a chance to prove good faith. Nor did it argue that the issue had not been raised in the District Court. It claimed instead, relying on the rationale of the Supreme Court of Iowa, that it *had* proved good faith. The State did not ask for another chance to satisfy the good-faith prong of the inevitable-discovery doctrine. Then, at the oral argument, the issue became sharper still. As the portions of the oral argument already quoted make clear, there was no suggestion by the State that this Court should not rule on the good-faith issue, or that some kind of additional evidentiary hearing should be held. Indeed, counsel for the State went so far as to say that "I'd like to leave it [the question of bad faith] in there and I'd like to have this Court find that in fact there was a lack of bad faith."

In these circumstances, we cannot agree that fairness requires that the State be given a new chance to show that its agent did not act in bad faith. At the time of the hearing on the motion to suppress, the State was the proponent. It had the burden of proof. It was offering evidence that had been obtained in a way that the Supreme Court of the United States had held unconstitutional. It was given an evidentiary hearing on the issue of admissibility. If, through a mistake of law, it failed to make its case, that should be the end of the matter. It is as if the State had failed to prove one element of the crime, and later argues that it should be given another chance.

The petition for rehearing is denied.

## OPINION ON PETITION FOR REHEARING EN BANC

Before LAY, Chief Judge, and HEANEY, BRIGHT, ROSS, McMILLIAN, ARNOLD, JOHN R. GIBSON and FAGG, Circuit Judges.

### ORDER

The petition for rehearing en banc is denied by an equally divided court.

FAGG, Circuit Judge, dissenting, joined by BRIGHT and ROSS, Circuit Judges.

I dissent from the order denying rehearing en banc.

I offer two reasons for an en banc submission:

*First,* the panel, in deciding the case, has relied upon a proposition that has not been placed in issue or litigated in the state and federal trial courts: whether Officer Leaming acted in bad faith in obtaining Williams' statement concerning the location of the murdered child's body.

*Second,* the case is one of significance in Iowa, involving a capital offense where the defendant has been convicted on two occasions by separate juries in different geographical locations within the state.

Specifically, the following chronology supports an en banc hearing:

*First,* in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the Supreme Court observed by footnote that the state might gain the admissibility of the murdered child's body under a theory of inevitable discovery.

*Second,* taking the lead offered by the Supreme Court footnote, an inevitable discovery theory was presented to a state trial judge prior to Williams' second trial in a motion to suppress. The prosecutor and defense counsel apparently viewed the contested theory as having only *one* prong, inevitable discovery of the body, and that was the issue presented to the trial judge. This would explain why the ruling of the trial judge made "no finding one way or the other on the question of bad faith" and why the ruling "does not even mention the [bad

faith] issue and seems to proceed on the assumption—contrary to the law *later* handed down by the Supreme Court of Iowa—that the State needed to show only that the body would have been discovered in any event". Panel opinion at 1169. (Emphasis added). I am of the impression that a single issue, inevitable discovery, was involved in the suppression hearing and that the trial court participants should not be charged with anticipating that the case would turn on a good faith/bad faith dichotomy.

*Third,* after the second trial, Williams appealed to the Iowa Supreme Court. *State v. Williams,* 285 N.W.2d 248 (Iowa 1979). As a matter of first impression, the court adopted a *two* pronged inevitable discovery rule. Instead of recognizing that one of the prongs had been litigated in the trial court (inevitable discovery) and the other had not (absence of bad faith), and remanding the case to the trial court for a limited evidentiary hearing, the Iowa Supreme Court did exactly what our panel says it did, namely, in the absence of evidence it ruled as a matter of law that Officer Leaming had acted in good faith.

*Fourth,* when Williams' petition for habeas relief was presented to District Judge Vietor, the issue formulation, submission, and resolution was the same as it had been in the state trial court: the question of inevitable discovery was at issue, the question of the officer's bad faith was not.

Finally, as I read the panel opinion, I cannot satisfy myself that the issue of the officer's good or bad faith has *ever* been the subject of an evidentiary hearing. If I am correct, then our panel is not in a position comfortably to find as a matter of law that Officer Leaming acted in bad faith, and this court is obligated to consider whether or not some form of limited remand is in order before putting its final imprint upon the case.

For the above reasons I believe the petition for rehearing en banc should be granted.

Circuit Judge JOHN R. GIBSON also votes to grant the rehearing en banc.